David **DANAHY**, Bette B. **Bissram**, Mary M. **Matthews**, Clarence **Mungo**, Bernadette T. **Burke**, Nick F. **Angiletta** and Peter **Henesey**, Plaintiffs–Appellees,

Barry **Weiss**, Linda Lalli **Stark** and Joel D. **Mahl**, Plaintiffs,

v.

Russell **BUSCAGLIA**, individually, Salvatore W. **Page**, individually, and Dennis C. **Vacco**, individually, Defendants–Appellants.

No. 2065, Docket 97–7264.

United States Court of Appeals, Second Circuit.

·Argued Sept. 25, 1997.

Decided Jan. 27, 1998.

Franklyn H. Snitow, New York City (Charles D. Cunningham, Richard A. Braunstein, Snitow and Pauley, of counsel), for Defendants–Appellants.

Craig T. Dickinson, White Plains, NY (Jonathan Lovett, Kim Patricia Berg, Lovett & Gould, of counsel), for Plaintiffs–Appellees.

Before MESKILL and CALABRESI, Circuit Judges, and BRIEANT,* District Judge.

---

* Hon. Charles L. Brieant, Judge United States District Court for the Southern District of New York, sitting by designation.

BRIEANT, District Judge.

The sole issue presented in this interlocutory appeal under the collateral order doctrine is whether Defendants, Attorney General of the State of New York, his former Acting Deputy and former Deputy for Administration are entitled to "qualified immunity" against the claim of Plaintiffs that they were discharged wrongfully from Government employment in violation of their First Amendment right of free association as explained in *Elrod–Branti* and its progeny.[1] We conclude that we have jurisdiction to hear this appeal under the collateral order doctrine and that based on the uncontested facts of record, defendants-appellants are entitled to qualified immunity as a matter of law.

Plaintiffs–Appellees (hereinafter Plaintiffs) were employed in the New York State Department of Law, Medicaid Fraud Control Unit ("MFCU"). In 1995, plaintiff Danahy was Supervising Special Investigator; plaintiffs Burke and Bissram were Senior Special Investigators; plaintiffs Matthews and Angilletta were Special Investigators; plaintiff Mungo was a Senior Special Auditor Investigator and plaintiff Henesey was an Investigative Clerk. Each was hired at will in the discretion of a prior Attorney General or his designee. No Plaintiff was within the classified service of the state as provided by the Civil Service Law; none were required to pass a competitive examination as a condition of appointment.

Defendant Dennis C. Vacco, a Republican, was elected Attorney General of New York effective January 1, 1995, changing the political control of the Department of Law for the first time since 1978. The Governor's office changed at the same time, Mr. Vacco having campaigned for election as part of a team led by newly elected Governor George E. Pataki.

The MFCU was established within the Department of Law by the Attorney General in 1975 pursuant to N.Y. Exec. Law § 63(3) and

(8) and continued pursuant to 42 C.F.R. § 1007.1 *et seq.* Originally it was called the Special Prosecutor's Office with jurisdiction limited to nursing homes and hospitals.[2]

42 C.F.R. § 1007.3 (1996) implements sections 1903(a)(6), 1903(b)(3) and 1903(q) of the Social Security Act as amended by the Medicare–Medicaid Anti–Fraud and Abuse Amendments. Pub.L. No. 95–142, 91 Stat. 1175 (1977). The Committee on Interstate and Foreign Commerce of the House of Representatives which reviewed the Medicare–Medicaid Anti–Fraud and Abuse Amendments stated in its Report that the legislation was intended to strengthen the capability of the Government to detect, prosecute and punish fraudulent activities under the Medicare and Medicaid programs. H.R.Rep. No. 95–393(II) at 38 (1977), *reprinted in* 1977 U.S.C.C.A.N. 3039, 3040. The Committee also noted that it was particularly impressed with the organization and operation of the New York Special Prosecutor's Office and the Committee believed that Office constituted a model for anti-fraud efforts in other states. *Id.* at 80, 1977 U.S.C.C.A.N. at 3087. In addition, the Committee emphasized the need for employment of highly skilled auditors, attorneys, and investigators specially trained in the area of Medicaid fraud, *id.* at 81, 1977 U.S.C.C.A.N. at 3083, noting that it had "received substantial evidence of the complex schemes employed by those engaging in fraudulent activities and not[ing] that the only way such practices can be effectively addressed [is] by utilizing persons specially skilled in uncovering these activities." *Id.* at 81, 1977 U.S.C.C.A.N. 3083–84.

42 C.F.R. § 1007.11 (1996) which describes the duties and responsibilities of the unit states in part:

(a) the unit will conduct a Statewide program for investigating and prosecuting (or referring for prosecution) violations of all applicable State laws pertaining to fraud in the administration of the Medicaid program, the provision of medical assis-

---

1. *Elrod v. Burns,* 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976), *Branti v. Finkel,* 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980).

2. On May 2, 1978, the Special Prosecutor's Office was officially designated as New York's Med-

icaid Fraud Control Unit and was expanded to include all Medicare-funded health care providers—physicians, dentists, labs, clinics, pharmacies, and medical equipment vendors, among others.

tance, or the activities of providers of medical assistance under the State Medicaid plan.

(b)(1) The unit will also review complaints alleging abuse or neglect of patients in health care facilities receiving payments under the State Medicaid plan and may review complaints of the misappropriation of patient's private funds in such facilities. (2) If the initial review indicates substantial potential for criminal prosecution, the unit will investigate the complaint or refer it to an appropriate criminal investigative or prosecutive authority.

. . . . .

(d) Where a prosecuting authority other than the unit is to assume responsibility for the prosecution of a case investigated by the unit, the unit will insure that those responsible for the prosecutive decision and the preparation of the case for trial have the fullest possible opportunity to participate in the investigation from its inception and will provide all necessary assistance to the prosecuting authority throughout all resulting prosecutions.

(e) The unit will make available to Federal investigators or prosecutors all information in its possession concerning fraud in the provision or administration of medical assistance under the State plan and will cooperate with such officials in coordinating any Federal and State investigations or prosecutions involving the same suspects or allegations.

In addition to investigating and prosecuting Medicaid fraud, the MFCU pursues other crimes relating to health care.

In 1995–96, the New York MFCU investigated and prosecuted cases involving sexual abuse and rape of nursing home patients by a certified nurses aide; a case of theft by submission of fraudulent bills for transporting Medicaid patients to and from their homes to health care providers, when the individuals claimed to have been transported were in fact dead at the time; several cases of theft and resale of prescriptions and drugs; a case of theft of cash receipts from Brooklyn Hospital, a Medicaid provider; several cases of fraudulent billing for laboratory tests which were unnecessary or never performed; and sued on and settled several large claims for over-billing, kickbacks and inflated costs on the part of hospitals and other providers.

Essentially, the MFCU is a statewide highly specialized prosecutor's office, exercising traditional prosecutorial discretion in its choice of cases.

42 C.F.R. § 1007.13 prescribes the inherent powers and qualifications of MFCU staff. It reads in relevant part as follows:

### § 1007.13 Staffing requirements

(a) The unit will employ sufficient professional, administrative, and support staff to carry out its duties and responsibilities in an effective and efficient manner. The staff must include:

(1) One or more attorneys experienced in the investigation or prosecution of civil fraud or criminal cases, who are capable of giving informed advice on applicable law and procedures and providing effective prosecution or liaison with other prosecutors;

(2) One or more experienced auditors capable of supervising the review of financial records and advising or assisting in the investigation of alleged fraud; and

(3) A senior investigator with substantial experience in commercial or financial investigations who is capable of supervising and directing the investigative activities of the unit.

(b) The unit will employ, or have available to it, professional staff who are knowledgeable about the provision of medical assistance under title XIX and about the operation of health care providers.

Upon his entry to office Mr. Vacco decided, in light of the "ongoing debate over the levels of Medicaid funding both at the State and Federal level" that "diminishing fraud was very important." (A–131). Also, he decided that the MFCU "didn't emphasize criminal law enforcement enough." (A–228). In furtherance of his vision of what the MFCU should be, he determined that each professional staff employee appointed to serve at the pleasure of the Attorney General

was required to reapply for the position which he or she then held. Defendant Vacco delegated the authority to decide whom to reappoint to First Deputy Attorney General William B. Flynn (not sued) and defendant Buscaglia, then Acting Deputy Attorney General for the MFCU. In mid-November, 1995, after such review, defendant Page, then Deputy for Administration of the Department of Law, sent letters to Appellees notifying them that they would not be reappointed to their positions in MFCU.

Plaintiffs commenced this action in March, 1996, against defendants individually, seeking money damages, alleging a claim under 42 U.S.C. § 1983 for violation of their right of association under the First Amendment, and other claims not relevant to this appeal. At the close of discovery, defendants moved for an order, pursuant to Fed.R.Civ.P. 56(b), granting summary judgment and dismissing the complaint on the grounds (i) that as "Policymaker/Confidential employees" the plaintiffs were not protected by the First Amendment from discharge on the grounds of their political affiliations[3], and (ii) that defendants are entitled to qualified immunity for the decisions to dismiss the plaintiffs from their positions.

With respect to qualified immunity, the district court held that "at the conclusion of all the evidence at a trial, the Court might be persuaded, or a jury might be persuaded, that there was enough uncertainty [as to whether plaintiffs were within the Policymaker/Confidential exception to the rule of Elrod/Branti] to permit invocation of the qualified immunity defense" (A–623).

### Discussion

■ The United States Supreme Court has held that political affiliation is a permissible employment criterion for some positions. *Elrod v. Burns,* 427 U.S. at 367, 96 S.Ct. at 2687; *Branti v. Finkel,* 445 U.S. at 517–18, 100 S.Ct. at 1294–95. In *Rutan v. Republican Party of Illinois,* 497 U.S. 62, 110 S.Ct. 2729, 111 L.Ed.2d 52 (1990) the Court summarized the so-called "*Elrod–Branti* political dismissal exception":

> In *Elrod* we suggested that policymaking and confidential employees probably could be dismissed on the basis of their political views. In *Branti,* we said that a State demonstrates a compelling interest in infringing First Amendment rights only when it can show that "party affiliation is an appropriate requirement for the effective . performance of the public office involved."

*Id.* at 71 n. 5, 110 S.Ct. at 2735 n. 5 (citation omitted).

To uphold defendants' right to qualified immunity in the context of this case, we need not resolve definitively that each plaintiff was within the Policymaker/Confidential exception to the rule of *Elrod–Branti.* Rather we consider whether it was objectively reasonable for defendants to believe that their actions were lawful at the time of the challenged act. *Lennon v. Miller,* 66 F.3d 416, 420 (2d Cir.1995) (citing *Anderson v. Creighton,* 483 U.S. 635, 641, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987)); *Robison v. Via,* 821 F.2d 913, 921 (2d Cir.1987).

■ Qualified immunity provides vital protection for government officials with discretionary responsibilities. The purpose of the qualified immunity doctrine is to balance the need to protect the rights of citizens through damage remedies, with the opposing need "to protect officials who are required to exercise their discretion and the related public interest in encouraging the vigorous exercise of official authority." *Butz v. Economou,* 438 U.S. 478, 506, 98 S.Ct. 2894, 2910, 57 L.Ed.2d 895 (1978); *Harlow v. Fitzgerald,* 457 U.S. 800, 806, 102 S.Ct. 2727, 2732, 73 L.Ed.2d 396 (1982). The Supreme Court in *Butz* expressed its expectation "that damages suits concerning constitutional violations need not proceed to trial, but can be terminated on a properly supported motion for summary judgment based on the defense of immunity." *Butz,* 438 U.S. at 508, 98 S.Ct. at 2911–12. As Judge Learned Hand stated, "to submit all officials, the innocent as well as the guilty,

---

**3.** Of Plaintiffs, Mr. Danahy was an enrolled Republican, two were Democrats and four were not enrolled in any political party. (A 11–13, A 426)

to the burden of a trial and to the inevitable danger of its outcome, would dampen the ardor of all but the most resolute, or the most irresponsible, in the unflinching discharge of their duties." *Gregoire v. Biddle*, 177 F.2d 579, 581 (2d Cir.1949).

 The doctrine of qualified immunity protects government officials from liability for civil damages if the challenged action "does not violate *clearly established* statutory or constitutional rights of which a reasonable person would have known." *Harlow*, 457 U.S. at 818, 102 S.Ct. at 2738 (emphasis added). A right is considered to be "clearly established" if "[t]he contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson*, 483 U.S. at 640, 107 S.Ct. at 3039.

This Court has held that "even if the interest asserted by the plaintiff was clearly of a type generally protected by federal law, the defendant is entitled to immunity as a matter of law if it was not clear at the time of the acts at issue that an exception did not permit those acts." *Robison*, 821 F.2d at 921; *Mitchell v. Forsyth*, 472 U.S. 511, 531–35, 105 S.Ct. 2806, 2818–20, 86 L.Ed.2d 411 (1985). The Policymaker/Confidential employee rule is just such an exception. This Court has also held that "even if the contours of the plaintiff's federal rights and the official's permissible actions were clearly delineated at the time of the acts complained of, the defendant may enjoy qualified immunity if it was objectively reasonable for him to believe that his acts did not violate those rights." *Robison*, 821 F.2d at 921.

 We explained in *Lennon* that a government official's actions will be considered objectively reasonable if "officers of reasonable competence could disagree" on the legality of defendant's actions. *Lennon*, 66 F.3d at 420 (quoting *Malley v. Briggs*, 475 U.S. 335, 341, 106 S.Ct. 1092, 1095–96, 89 L.Ed.2d 271 (1986) (internal quotation marks omitted)). In making this inquiry we consider whether any reasonable jury "looking at the evidence in the light most favorable to, and drawing all inferences most favorable to, the plaintiffs, could conclude that it was objectively unreasonable for the defendant[s]" to believe that their actions were not clearly violating the plaintiffs' established federally protected rights. *Id.* (quoting *Halperin v. Kissinger*, 807 F.2d 180, 189 (D.C.Cir.1986)(internal quotation marks omitted)). If so, summary judgment is denied. "[I]f the court determines that the only conclusion a rational jury could reach is that reasonable officers would disagree about the legality of the defendants' conduct under the circumstances, summary judgment for the officers is appropriate." *Id.* at 421. We conclude as a matter of law that it was "objectively reasonable" within the rule of *Robison v. Via*, 821 F.2d at 921, for defendants to believe that all the plaintiffs' positions were indeed within the Policymaker/Confidential exception to *Elrod–Branti*.

In *Regan v. Boogertman*, 984 F.2d 577, 580 (2d Cir.1993) we held that in determining whether the patronage dismissal of a public employee violated the employees' First Amendment rights, the Court must look at the powers inherent in the office rather than the actions actually taken by the employee while in office. *Vezzetti v. Pellegrini*, 22 F.3d 483 (2d Cir.1994), decided after *Regan*, listed eight non-exclusive factors the Court should consider in determining whether a public employee fits within the Policymaker/Confidential exception for positions and may be discharged at will. These factors include whether the employee (1) is exempt from civil service protection, (2) has some technical competence or expertise, (3) controls others, (4) is authorized to speak in the name of policymakers, (5) is perceived as a policymaker by the public, (6) influences government programs, (7) has contact with elected officials, and (8) is responsive to partisan politics and political leaders. *Vezzetti*, 22 F.3d at 486. This is not "an exhaustive list of indicators, nor is any one factor or group of them always dispositive." *Id.* We also noted in *Vezzetti*, "that the *Branti* guidelines do not lend themselves to easy or automatic application." *Id.* (citing *Hawkins v. Steingut*, 829 F.2d 317, 320 (2d Cir.1987)(internal quotation marks omitted)).

 Under the collateral order doctrine the question of qualified immunity may be

decided as a matter of law if the plaintiff is given the benefit of all disputed issues of fact and qualified immunity is granted solely on the basis of undisputed facts. *Salim v. Proulx,* 93 F.3d 86, 90 (2d Cir.1996); *see also Johnson v. Jones,* 515 U.S. 304, 313, 115 S.Ct. 2151, 2155, 132 L.Ed.2d 238 (1995); *Mitchell,* 472 U.S. at 528, 105 S.Ct. at 2816. As the court in *Salim* stated, "[a]n appeal is available ... to challenge the trial judge's rejection of the immunity defense where the defendant contends that ... on the facts favorable to the plaintiff that the trial judge concluded the jury might find, the immunity defense is established as a matter of law because those facts show ... that it was objectively reasonable for him to believe that his action did not violate clearly established law." *Salim,* 93 F.3d at 90–91. Here the district court concluded that the questions of whether the plaintiffs had been subjected to patronage dismissals and whether plaintiffs were policymakers were for the jury. For the purposes of jurisdiction, and in accord with *Salim,* we assume the truth of the plaintiffs' claims that they were subjected to patronage dismissals and that they were not policymakers.

We hasten to add that the district court erroneously concluded that the policymaker inquiry was for the jury. This was the prevailing but erroneous view at the time. Subsequently in *Gordon v. County of Rockland,* 110 F.3d 886, 888–89 (2d Cir.1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 74, 139 L.Ed.2d 34 (1997), this Court explained that such inquiry presents a question of law informed solely by the job description and the powers of office. Later in *McEvoy v. Spencer,* 124 F.3d 92 (2d Cir.1997) we clarified *Gordon* to include consideration of a statutory job description.

Because the policymaker question is one of law for the court, it is not a disputed issue of fact which we are required, under *Salim,* to construe in favor of the plaintiffs for whom we have official or statutory job descriptions. In this case, an administrative job description is in the record for Danahy, and statutory job descriptions are available for Bissram, Burke, and Mungo. As to them, we have sufficient information to determine whether they were policymakers without reaching defendants' qualified immunity defense. Because, however, the qualified immunity doctrine is a means comprehensively to dispose of all the plaintiffs' First Amendment claims, we dismiss plaintiffs' claims on this basis. To reach the qualified immunity question, we assume *arguendo* that plaintiffs were not policymakers.

Defendants were required to determine whether they were allowed to dismiss plaintiffs without violating plaintiffs' First Amendment rights. In making those determinations defendants did not have the benefit of this Court's subsequent decisions in *Bavaro v. Pataki,* 130 F.3d 46 (2d Cir.1997); *McEvoy v. Spencer,* 124 F.3d 92 (2d Cir.1997); *Vona v. County of Niagara,* 119 F.3d 201 (2d Cir.1997); *Gordon,* 110 F.3d 886 (2d Cir. 1997). Accordingly we examine the conclusion reached by defendants, that the discharge of these Confidential employees was lawful under the exception to *Elrod–Branti,* on the basis of what was objectively reasonable measured by the applicable legal rules at the time they acted.

In considering whether defendants acted reasonably all the facts known to the defendants concerning plaintiff's jobs and the office in which they worked are significant. These are: plaintiffs were skilled employees of an important, highly specialized statewide prosecutor's office designed to root out complex fraudulent schemes; all plaintiffs worked closely with the Special Assistant Attorney's General ("SAAGs") appointed for MFCU to investigate and prosecute charges of Medicaid fraud and other crimes. They dealt with highly confidential matters pertaining to the exercise of prosecutorial discretion as well as investigating, auditing and case preparation duties. All were exempt from civil service protection and hired to serve at the pleasure of an elected constitutional officer of the State of New York or his designee.

Officials executing the prosecutorial function convey an administration's policy to the public in the most direct and immediate sense. As noted earlier in this opinion, the investigations conducted by the MFCU often have a high public profile, which augments

the connection between plaintiffs' work and the policies of the administration. Plaintiffs in this case were contributing to the prosecutorial decisions of the MFCU by identifying the miscreants to be investigated and prosecuted, and those to be left alone, thereby participating in the exercise of prosecutorial discretion, on a confidential level.

Courts have held consistently that prosecutors are Policymaker/Confidential employees. In *Branti* the Supreme Court held that its finding concerning public defenders "is in contrast to the broader public responsibilities of an official such as a prosecutor." *Branti,* 445 U.S. at 519 n. 13, 100 S.Ct. at 1295 n. 13 (citing *Newcomb v. Brennan,* 558 F.2d 825, 830–31 (7th Cir.1977) (upholding political dismissal of deputy city attorney)); *see also Americanos v. Carter,* 74 F.3d 138, 143 (7th Cir.1996) (state deputy attorney general), *cert denied,* —— U.S. ——, 116 S.Ct. 1853, 134 L.Ed.2d 953 (1996); *Monks v. Marlinga,* 923 F.2d 423, 426 (6th Cir.1991) (assistant prosecutor); *Clark v. Brown,* 861 F.2d 66, 68 (4th Cir.1988) (assistant prosecutor); *Livas v. Petka,* 711 F.2d 798, 800–01 (7th Cir.1983) (assistant prosecutor); *Mummau v. Ranck,* 687 F.2d 9, 10 (3d Cir.1982) (assistant prosecutor).

In addition seemingly ministerial job duties do not warrant an automatic denial of qualified immunity. *See Regan v. Boogertman,* 984 F.2d 577 (2d Cir.1993) (town deputy tax receiver); *Savage v. Gorski,* 850 F.2d 64 (2d Cir.1988) (Confidential Secretary to the Director of the Erie County Correctional Facility, Coordinator for Pre–Trial Release Services, and First Deputy Service Officer of the County Veterans Service Agency); *Blair v. Meade,* 76 F.3d 97 (6th Cir.1996) (Bookkeeper and Assistant to the Chief Financial Officer of County), *Wilbur v. Mahan,* 3 F.3d 214 (7th Cir.1993) (deputy sheriff); *Faughender v. City of North Olmsted, Ohio,* 927 F.2d 909 (6th Cir.1991) (mayor's secretary); *Hudson v. Burke,* 913 F.2d 427 (7th Cir.1990) ("investigators" or "legislative aides" for city finance committee). Because the plaintiffs in this case worked closely with the prosecutors on confidential matters, they could be considered "confidential" employees within the *El-*

*rod–Branti* exception regardless of whether their job duties appear to be ministerial.

A related indicator of Policymaker/Confidential status is authority to receive and transmit confidential information. Defendants knew that all of the plaintiffs' jobs entailed working closely and directly with the prosecutors (A–73, A–418, A–420, A–576), and by virtue of plaintiffs' job titles, which all contain the word "Investigator" (except for plaintiff Henesey who was an Investigative Clerk), and plaintiffs' own statements, defendants could infer that plaintiffs' jobs entailed access to confidential information relating to pending investigations and prosecutions (A–47 (Bissram, surveillance and undercover work), A–333 (Burke, undercover operations), A–61 (Henesey, analysis of Medicaid recipients billing and extensive interviews with recipients and providers, and custody of evidence) A–420 (Danahy, investigators' responsibilities included involvement with confidential informants)).

As part of its holding in *Branti* that public defenders were not Policymaker/Confidential employees, the Supreme Court noted that a public defender's duty is "to serve the undivided interests of [individual] client[s] and "is not to the public at large." *Branti,* 445 U.S. at 519, 100 S.Ct. at 1295 (citation and internal quotation marks omitted). In addition the Supreme Court noted that "the confidential information to which a public defender is privy arises "out of various attorney-client relationships," that "has no bearing whatsoever on partisan political concerns." *Id.* As part of their jobs, each plaintiff in this case received and conveyed confidential information relating to pending investigations and prosecutions. This information did not arise out of any type of professional relationship with those being investigated and, as noted above, the information and the use to which it is put does bear on partisan political concerns. It is used to implement the administration's policy of aggressively prosecuting Medicaid and Medicare fraud. Because of plaintiffs' access to confidential information, the defendants, acting as they did under the governing legal rules at the time, were entitled to qualified immunity.

Another indicator of Policymaker/Confidential status is exemption from civil service protection. The positions that plaintiffs' filled were exempt and defendants were aware of this status.[4] This fact contributes to the reasonableness of the Defendants' belief that they were not violating plaintiff's rights by dismissing them.[5]

The foregoing observations are expressed not to support a finding that plaintiffs were Policymaker/Confidential employees as a matter of law, but rather to show that officers of reasonable competence, based on the information before the defendants concerning the positions of plaintiffs, measured against the decided federal cases (i.e., those in existence at the time the defendants acted) applying the *Elrod/Branti* exception, could reasonably have perceived that they were, and therefore that defendants are entitled to qualified immunity. As the Court in *McEvoy* stated, "although the record at this stage does not permit an ultimate decision as to whether the ... position is a policymaking one, the available record adequately supports the defendants' claim that it was objectively reasonable for them to believe that it was." *McEvoy*, 124 F.3d at 105.

For purposes of qualified immunity, enough facts were known to defendants so that an officer of reasonable competence could believe that all of the plaintiffs held confidential positions in a highly specialized prosecutor's office.[6] And in this case, since enough such information was available to the defendants, we can conclude that their judgments about the inherent powers and confidentiality of plaintiffs' jobs were objectively reasonable.

Defendants in this case knew the functions or duties being performed by the plaintiffs, directly from their own admissions and they could infer reasonably that all were working in title and that their job titles were consistent with their job responsibilities.

Reasonably competent officials not intending to violate anybody's Constitutional rights could have, and did, perceive reasonably that they could replace the plaintiffs. To subject public officials who made their decisions before *Gordon* to a damages trial on remand simply because the official job descriptions are not in the record is unfair and unwarranted. And a remand for purposes of adding the job descriptions will impose upon defendants the very burden from which the doctrine of qualified immunity was intended to relieve them.

Concluding that defendants are entitled to qualified immunity, we vacate the order appealed from and remand for proceedings consistent with this decision.

---

4. It turns out that the reason for the exempt status of plaintiffs' positions was purely fortuitous, in that all "temporary" positions in New York are exempt. *See Largo v. Vacco*, Index No. 1183/96 (N.Y. Sup.Ct. Albany County 1996), decided after the events at issue. However this was not necessarily apparent to a reasonable official in defendant's position.

5. *See* N.Y. Const. art. V, § 6; *Burke v. Axelrod*, 90 A.D.2d 577, 578, 456 N.Y.S.2d 135, 137 (3d Dep't 1982) "The criteria [for exempt positions] are the confidential nature of the position, the performance of duties which require the exercise of authority or discretion at a high level or the need ... to have some expertise or personal qualities which cannot be measured by a competitive examination."

6. In *Gordon*, 110 F.3d at 888, we ruled that a fired employee's job description should be consulted to determine the employee's inherent powers. *See also Bavaro*, 130 F.3d at 49; *Vona*, 119 F.3d at 207. In *McEvoy*, 124 F.3d at 105, we made clear that a statutory job description may be enough to meet the *Gordon* requirement.

The record here is silent as to whether defendants referred to the job descriptions of all plaintiffs. However it is clear that the district court did not have all the job descriptions when it ruled on the issue of qualified immunity. Because the defendants acted before *Gordon* was decided, we need not reach, and do not consider, the issue of qualified immunity in connection with patronage discharges taking place after *Gordon*.