**Barbara B. BUTLER, Plaintiff,**

v.

**NEW YORK STATE DEPARTMENT OF LAW, Dennis Vacco and William Flynn, Defendants.**

**No. 96 CIV. 5697(CLB).**

United States District Court, S.D. New York.

March 25, 1998.

Daniel J. O'Donnell, New York, NY, for Plaintiff.

Franklyn H. Snitow, Richard A. Braunstein, Snitow & Pauley, New York, NY, for Defendant.

## MEMORANDUM & ORDER

BRIEANT, District Judge.

Before this Court for decision is the motion of the defendants, New York State Department of Law ("DoL"), the Hon. Dennis C. Vacco, the Attorney General of the State of New York, and the Hon. William M. Flynn, First Deputy Attorney General of the State of New York, for summary judgment pursuant to Fed.R.Civ.P. 56(b).

Plaintiff Barbara B. Butler, a former Deputy Bureau Chief in the New York State DoL, alleges that she was unlawfully discharged from her position as an Assistant Attorney General of New York in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., the Age Discrimination in Employment Act of 1967, 29 USC §§ 621 et seq. ("ADEA"), her First Amendment rights and state laws. She is seeking back pay, front pay, compensatory damages and reinstatement. The motion was held pending the decision of our Court of Appeals in Danahy v. Buscaglia, 134 F.3d 1185 (2d Cir.1998) which was decided on January 27, 1998.

Danahy was a patronage discharge case in which seven employees of the Medicaid Fraud Control Unit of the DoL sued Mr. Vacco and two of his Deputies for wrongful discharge from government employment in violation of their First Amendment right of free association. Our Court of Appeals held that Mr. Vacco and his Deputies were entitled to qualified immunity for their decision to discharge the employees. The holding in Danahy is decisive on the issue of Ms. Butler's political discharge claim, but not on her ADEA and Title VII claims.

### Background

Ms. Butler was appointed to the position of Assistant Attorney General ("AAG") in 1980 by Robert Abrams, then Attorney General of the State of New York. In 1981 she was promoted to Section Chief, and in 1983 she was promoted to Deputy Bureau Chief of the New York City Litigation Bureau ("the Bureau"). The Bureau represents State agencies, the officials who manage them and other State employees in civil litigation arising out of the performance of their official functions. It is managed by a Bureau Chief, two Deputy Bureau Chiefs and ten Section Chiefs. Her employment was to serve at the pleasure of the Attorney General and her job was at all times in the "Exempt" class under New York State Civil Service.

Mr. Vacco, a Republican, was elected Attorney General of New York effective January 1, 1995, changing the political control of the DoL for the first time since 1978. Upon his entry to office Mr. Vacco informed employees of the DoL that a review of staff would be conducted and that all AAG's would be required to reapply for appointment. Ms. Butler reapplied for the position of AAG and was interviewed. In early June she received a letter from Salvatore W. Page, Deputy for Administration (not sued), dated June 2, 1995 informing her that she would not be offered continued employment as an AAG. Ms. Butler received a right to sue letter from the Equal Employment Opportunity Commission dated May 1, 1996 and filed the Complaint in this action on July 26, 1996.

The defendants claim that Ms. Butler is not entitled to protection from political discharge as she is a "policymaker;" that she is not entitled to protection from age and gender discrimination under Title VII and the ADEA because she falls under the "policymaker" exception to those statutes; and alternatively that the defendants are entitled to qualified immunity.

*Discussion*

### I. Summary Judgment

Summary judgment is appropriate only where the moving party demonstrates that there exists no genuine issue of material fact, and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Id.* A properly asserted summary judgment motion can be defeated by the non-moving party by demonstrating the existence of a material issue of fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323–24, 106 S.Ct. 2548, 2552–54, 91 L.Ed.2d 265 (1986); *Williams v. Smith,* 781 F.2d 319, 323 (2d Cir.1986).

To sustain this burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1355, 89 L.Ed.2d 538 (1986); *Williams,* 781 F.2d at 323 ("Mere conclusory allegations or denials will not suffice."). In turn, the moving party may discharge its burden by "pointing out to the district court—that there is an absence of evidence to support the non-moving party's case." *Celotex,* 477 U.S. at 325, 106 S.Ct. at 2554. Even where evidence is offered, summary judgment may still be granted if that evidence is not significantly probative. *Anderson,* 477 U.S. at 249–50, 106 S.Ct. at 2510–11.

### II. Political Discharge

 As a general rule public employees may not be dismissed for the exercise of their First Amendment rights. However, the United States Supreme Court has held that political affiliation is a permissible employment criterion for some positions. *Elrod v. Burns,* 427 U.S. 347, 367, 96 S.Ct. 2673, 2687, 49 L.Ed.2d 547 (1976); *Branti v. Finkel,* 445 U.S. 507, 517–18, 100 S.Ct. 1287, 1294–95, 63 L.Ed.2d 574 (1980). In *Rutan v. Republican Party of Illinois,* 497 U.S. 62, 110 S.Ct. 2729, 111 L.Ed.2d 52 (1990) the Court summarized the so-called *"Elrod–Branti* political dismissal exception:"

> In *Elrod* we suggested that policymaking and confidential employees probably could be dismissed on the basis of their political views. In *Branti,* we said that a State demonstrates a compelling interest in infringing First Amendment rights only when it can show that party affiliation is an appropriate requirement for the effective performance of the public office involved.

*Id.* at 71 n. 5, 110 S.Ct. at 2735 n. 5 (citation omitted). The first issue presented in this case is whether the public employment position held by Ms. Butler falls within this "policymaker" exception to First Amendment protection. This Court concludes that it does.

In *Gordon v. County of Rockland,* 110 F.3d 886, 890 (2d Cir.1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 74, 139 L.Ed.2d 34 (1997), our Court of Appeals noted that "[a]ll circuit court decisions- and almost all other court decisions involving attorneys in government service, other than public defenders, have held that Elrod/Branti do not protect those positions" (citation omitted). Prosecutors in particular have been held to fit within the policymaker exception to Elrod/Branti. *See Danahy,* 134 F.3d at 1192 (listing cases).

In *Gordon,* our Court of Appeals held that the policymaker inquiry presents a question of law informed by the discharged employee's job description and the powers inherent in the office rather than the actions actually taken by the employee while in office. In *McEvoy v. Spencer,* 124 F.3d 92 (2d Cir. 1997), *Gordon* was clarified to include consideration of a statutory job description. Ms. Butler's official job title while she was employed by the DoL was Assistant Attorney General. *See* Berens Declaration. The official job description for an AAG states that she, "[p]erforms all the duties of an Assistant Attorney General, such as appearing for the Attorney General before State and Federal Courts, preparing, presenting, and arguing cases, examining witnesses, conducting hear-

ings under oath and preparing evidence, briefs and memoranda of law." [1]

The Attorney General is an elected constitutional officer whose job description is found in § 63 of the New York Executive Law which reads in relevant part as follows:

§ 63. General Duties

The attorney general shall:

1. Prosecute and defend all actions and proceedings in which the state is interested, and have charge and control of all the legal business of the departments and bureaus of the state, or of any office thereof which requires the services of attorney or counsel, in order to protect the interest' of the state, but this section shall not apply to any of the military department bureaus or military offices of the state. No action or proceeding affecting the property or interests of the state shall be instituted, defended or conducted by any department, bureau, board, council, officer, agency or instrumentality of the state, without a notice to the attorney-general apprising him of the said action or proceeding, the nature and purpose thereof, so that he may participate or join therein if in his opinion the interests of the state so warrant.

2. Whenever required by the governor, attend in person, or by one of his deputies, any term of the supreme court or appear before the grand jury thereof for the purpose of managing and conducting in such court or before such jury criminal actions or proceedings as shall be specified in such requirement; in which case the attorney-general or his deputy so attending shall exercise all the powers and perform all the duties in respect of such actions or proceedings, which the district attorney would otherwise be authorized or required to exercise or perform; and in any of such actions or proceedings the district attorney shall only exercise such powers and perform such duties as are required of him by the attorney-general or the deputy attorney-general so attending. In all such cases all expenses incurred by the attorney-general, including the salary or other compensation of all deputies employed, shall be a county charge.

3. Upon request of the governor, comptroller, secretary of state, commissioner of transportation, superintendent of insurance, superintendent of banks, commissioner of taxation and finance or commissioner of motor vehicles, or the head of any other department, authority, division or agency of the state, investigate the alleged commission of any indictable offense or offenses in violation of the law which the officer making the request is especially required to execute or in relation to any matters connected with such department, and to prosecute the person or persons believed to have committed the same and any crime or offense arising out of such investigation or prosecution or both, including but not limited to appearing before and presenting all such matters to a grand jury.

4. Cause all persons indicted for corrupting or attempting to corrupt any member or member-elect of the legislature, or the commissioner of general services, to be brought to trial.

5. When required by the comptroller or the superintendent of public works [now commissioner of transportation], prepare proper drafts for contracts, obligations and other instruments for the use of the state.

6. Upon receipt thereof, pay into the treasury all moneys received by him for debts due or penalties forfeited to the people of the state.

7. He may, on behalf of the state, agree upon a case containing a statement of the facts and submit a controversy for decision to a court of record which would have jurisdiction of an action brought on the same case. He may agree that a referee, to be appointed in an action to which the state is a party, shall receive such compensation at such rate per day as the court in the order of reference may specify. He may with the approval of the governor retain counsel to recover moneys or property belonging to the state, or to the pos-

---

1. *See also,* N.Y. Exec. Law § 62: "The attorney-general may appoint such assistant attorneys-general, deputy assistant attorneys-general and attorneys as he may deem necessary and fix their compensation within the amounts appropriated therefor."

session of which the state is entitled, upon an agreement that such counsel shall receive reasonable compensation, to be fixed by the attorney general, out of the property recovered, and not otherwise.

8. Whenever in his judgment the public interest requires it, the attorney-general may, with the approval of the governor, and when directed by the governor, shall, inquire into matters concerning the public peace, public safety and public justice. For such purpose he may, in his discretion, and without civil service examination, appoint and employ, and at the pleasure remove, such deputies, officers and other persons as he deems necessary, determine their duties and, with the approval of the governor, fix their compensation. All appointments made pursuant to this subdivision shall be immediately reported to the governor, and shall not be reported to any other state officer or department. Payments of salaries and compensation of officers and employees and of the expenses of the inquiry shall be made out of funds provided by the legislature for such purposes, which shall be deposited in a bank or trust company in the names of the governor and the attorney-general, payable only on the draft or check of the attorney-general, countersigned by the governor, and such disbursements shall be subject to no audit except by the governor and the attorney-general. The attorney-general, his deputy, or other officer, designated by him, is empowered to subpoena witnesses, compel their attendance, examine them under oath before himself or a magistrate and require that any books, records, documents or papers relevant or material to the inquiry be turned over to him for inspection, examination or audit, pursuant to the civil practice law and rules. If a person subpoenaed to attend upon such inquiry fails to obey the command of a subpoena without reasonable cause, or if a person in attendance upon such inquiry shall, without reasonable cause, refuse to be sworn or to be examined or to answer a question or to produce a book or paper, when ordered so to do by the officer conducting such inquiry, he shall be guilty of a misdemeanor. It shall be the duty of all public officers, their deputies, assistants and subordinates, clerks and employees, and all other persons, to render and furnish to the attorney-general, his deputy or other designated officer, when requested, all information and assistance in their possession and within their power. Each deputy or other officer appointed or designated to conduct such inquiry shall made [sic] a weekly report in detail to the attorney-general, in form to be approved by the governor and the attorney-general, which report shall be in duplicate, one copy of which shall be forthwith, upon its receipt by the attorney-general, transmitted by him to the governor. Any officer participating in such inquiry and any person examined as a witness upon such inquiry who shall disclose to any person other than the governor or the attorney-general the name of any witness examined or any information obtained upon such inquiry, except as directed by the governor or the attorney-general, shall be guilty of a misdemeanor.

9. Bring and prosecute or defend upon request of the industrial commissioner [now commissioner of labor] or the state division of human rights, any civil action or proceeding, the institution or defense of which in his judgment is necessary for effective enforcement of the laws of this state against discrimination by reason of age, race, creed, color or national origin, or for enforcement of any order or determination of such commissioner or division made pursuant to such laws.

10. Prosecute every person charged with the commission of a criminal offense in violation of any of the laws of this state against discrimination because of race, creed, color, or national origin, in any case where in his judgment, because of the extent of the offense, such prosecution cannot be effectively carried on by the district attorney of the county wherein the offense or a portion thereof is alleged to have been committed, or where in his judgment the district attorney has erroneously failed or refused to prosecute. In all such proceedings, the attorney-general may appear in person or by his deputy or assistant before any court or any grand jury and exercise

all the powers and perform all the duties in respect of such actions or proceedings which the district attorney would otherwise be authorized or required to exercise or perform.

11. Prosecute and defend all actions and proceedings in connection with safeguarding and enforcing the state's remainder interest in any trust which meets the requirements of subparagraph two of paragraph (b) of subdivision two of section three hundred sixty-six of the social services law.

12. Whenever any person shall engage in repeated fraudulent or illegal acts or otherwise demonstrate persistent fraud or illegality in the carrying on, conducting or transaction of business, the attorney general may apply, in the name of the people of the state of New York, to the supreme court of the state of New York, on notice of five days, for an order enjoining the continuance of such business activity or of any fraudulent or illegal acts, directing restitution and damages and, in an appropriate case, cancelling any certificate filed under and by virtue of the provisions of section four hundred forty of the former penal law [now General Business Law § 130] or section one hundred thirty of the general business law, and the court may award the relief applied for or so much thereof as it may deem proper. The word "fraud" or "fraudulent" as used herein shall include any device, scheme or artifice to defraud and any deception, misrepresentation, concealment, suppression, false pretense, false promise or unconscionable contractual provisions. The term "persistent fraud" or "illegality" as used herein shall include continuance or carrying on of any fraudulent or illegal act or conduct. The term "repeated" as used herein shall include repetition of any separate and distinct fraudulent or illegal act, or conduct which affects more than one person.

In connection with any such application, the attorney general is authorized to take proof and make a determination of the relevant facts and to issue subpoenas in accordance with the civil practice law and rules. Such authorization shall not abate or terminate by reason of any action or proceeding brought by the attorney general under this section.

13. Prosecute any person for perjury committed during the course of any investigation conducted by the attorney-general pursuant to statute. In all such proceedings, the attorney-general may appear in person or by his deputy or assistant before any court or any grand jury and exercise all the powers and perform all the duties necessary or required to be exercised or performed in prosecuting any such person for such offense.

15. [So in original. There is no subd. 14] In any case where the attorney general has authority to institute a civil action or proceeding in connection with the enforcement of a law of this state, in lieu thereof he may accept an assurance of discontinuance of any act or practice in violation of such law from any person engaged or who has engaged in such act or practice. Such assurance may include a stipulation for the voluntary payment by the alleged violator of the reasonable costs and disbursements incurred by the attorney general during the course of his investigation. Evidence of a violation of such assurance shall constitute prima facie proof of violation of the applicable law in any civil action or proceeding thereafter commenced by the attorney general.

In *Vezzetti v. Pellegrini*, 22 F.3d 483 (2d Cir.1994), our Court of Appeals listed eight non-exclusive factors for courts to consider in determining whether an employee fits within the policymaker exception.

These factors include whether the employee (1) is exempt from civil service protection, (2) has some technical competence or expertise, (3) controls others, (4) is authorized to speak in the name of policymakers, (5) is perceived as a policymaker by the public, (6) influences government programs, (7) has contact with elected officials, and (8) is responsive to partisan politics and political leaders.

22 F.3d at 486.

First and foremost Ms. Butler was a bona fide exempt employee. *See* N.Y. Civ. Serv.

Law §§ 35, 40, 41; N.Y.C.R.R. § 2.1.[2] The letter she received from then Attorney General Abrams appointing her to her position stated, "[a]s you know, your appointment is terminable by me at will-that is, you serve at the pleasure of the Attorney General." Ex. L. Second, as an attorney she possessed expertise and competence in her field distinguishing her from lower level employees. Third, she controlled a significant number of employees as Deputy Bureau Chief (10 Section Chiefs and 112 employees—80 attorneys and 32 other staff members).[3]

The remaining *Vezzetti* factors were condensed by the *Gordon* Court into the question "whether the employee in question is empowered to act and speak on behalf of a policymaker, especially an elected official." *Gordon*, 110 F.3d at 890. Ms. Butler clearly was. The job description states that an Assistant Attorney General "appear[s] for the Attorney General." *See also* N.Y. Exec. Law § 62; *DeLucia v. Lefkowitz*, 62 A.D.2d 674, 406 N.Y.S.2d 150, (3d Dep't 1978), *aff'd, sub nom* 48 N.Y.2d 901, 424 N.Y.S.2d 897, 400 N.E.2d 1349 (1979).[4]

Because her position is a policymaking one, Ms. Butler is not entitled to First Amendment protection from a patronage dismissal. Accordingly, summary judgment is granted to defendants on this claim.

■ Alternatively, defendants Vacco and Flynn individually are entitled to dismissal on the ground of qualified immunity, as this case is indistinguishable from *Danahy*. To the extent they are sued in their official capacities, they are not a "person" within the meaning of § 1983 and no claim can be asserted against them in that capacity. The same is true as to the Department of Law, which is in effect the State of New York itself. *See Will v. Michigan Department of State Police*, 491 U.S. 58, 71, 109 S.Ct. 2304, 2312, L.Ed.3d 45 (1989) and *Simpson v. Vacco*, 1998 WL 118155 (S.D.N.Y. March 17, 1998).

## II. Title VII and the ADEA

■ Ms. Butler also alleges that she was dismissed from her position because she was over 40 years old and female. Because there is no individual liability under Title VII or the ADEA, *Tomka v. Seiler Corp.*, 66 F.3d 1295, 1312 (2d Cir.1995), these claims may only be maintained against the DoL. A prima facie case under both Title VII and the ADEA consists of the following elements: (1) membership in the protected class, (2) qualification for the position, (3) denial of the position or discharge and (4) the fact that the denial or discharge occurred in circumstances giving rise to an inference of discrimination *on the basis of the plaintiffs membership in the protected class*. *See Stern v. Trustees of Columbia University*, 131 F.3d 305 (2d Cir.1997) (Title VII); *Woroski v. Nashua Corp.*, 31 F.3d 105 (2d Cir.1994) (ADEA). Ms. Butler meets the first three qualifications. The only allegation she makes concerning the fourth element is that, as to her age discrimination claim she was replaced by a younger employee and, "is informed that the selection procedure used in the process of reappointing and appointing

**2.** *See* N.Y. Const. art. V, § 6; *Burke v. Axelrod*, 90 A.D.2d 577, 578, 456 N.Y.S.2d 135, 137 (3d Dep't 1982) "The criteria [for exempt positions] are the confidential nature of the position, the performance of duties which require the exercise of authority or discretion at a high level or the need... to have some expertise or personal qualities which cannot be measured by a competitive examination."

**3.** This responsibility is apparently part of her job as a Deputy Bureau Chief and is not contained in the job description for Assistant Attorney General.

**4.** "From a reading of section 63 of the Executive Law, it is apparent that the Attorney General is invested with a broad range of powers, far too many for one person to execute. In fact, in at least three instances, a deputy is specifically mandated to act in the stead of the Attorney general (Executive Law § 63, subd. 2; subd 8; subd 10). The statutes thus contemplate delegation of the Attorney General's authority.

Beyond this statutory authorization, it is apparent that every Assistant Attorney General acts as surrogate for the Attorney General when called upon to take a position in court, to appear for any agency of government or to litigate or dispose of any legal matter. The Assistant Attorney General performs his duties in the name of and on behalf of the Attorney General. He or she acts independently when making legal decisions or in deciding matters of policy." *Delucia*, 62 A.D.2d at 679, 406 N.Y.S.2d at 153.

assistants attorney general impacted adversely on candidates over forty years of age." Complaint ¶ 22. Regarding her Title VII claim Ms. Butler does not allege in her complaint that she was replaced by a male employee, and states only that she, "is informed that the selection procedure used in the process of reappointing assistants attorney general resulted in a disproportionately high number of women being at a deputy level or higher fired." *Id.*

■ It is true that a prima facie case of discrimination may rest on a minimal or evanescent evidentiary showing. *See Fisher v. Vassar College,* 114 F.3d 1332, 1335 (2d Cir. 1997) (en banc), *cert denied* —— U.S. ——, 118 S.Ct. 851, 139 L.Ed.2d 752; *American Federation of State v. County of Nassau,* 96 F.3d 644, 651 (2d Cir.1996). Our Supreme Court has held, however, that "the prima facie case requires 'evidence adequate to create an inference that an employment decision was based on a[n] [illegal] discriminatory criterion...'" *O'Connor v. Consolidated Coin Caterers Corp.,* 517 U.S. 308, 312, 116 S.Ct. 1307, 1310, 134 L.Ed.2d 433 (1996) (quoting *Teamsters v. United States,* 431 U.S. 324, 358, 97 S.Ct. 1843, 1866, 52 L.Ed.2d 396 (1977)).

This Court concludes that Ms. Butler's evidence does not demonstrate sufficiently that her dismissal occurred in circumstances giving rise to an inference of discrimination *on the basis of her age or gender.* Her dismissal occurred following the election of Mr. Vacco as Attorney General and was part of the general change and upheaval in administration of the DoL which took place at the start of the new administration. Ms. Butler herself argues that her termination was the result of political patronage, and it probably was, although not all political appointees of the prior administration were denied reappointment.

The Equal Employment Opportunity Commission apparently agreed that her dismissal was political. Its letter to Ms. Butler stated, "[i]t appears from the evidence in your case that the terminations referred to in your charge, were terminations following the election of Dennis Vacco, Attorney General on January 1, 1995. The evidence suggests that the actions taken by respondent may have been politically motivated; even though you disagree, it is very unlikely that EEOC would find a violation if it invested additional resources in this case." *See* Ex. B, EEOC letter dated May 1, 1996.

■ If Ms. Butler's proffered evidence were sufficient to present a prima facie case, the Court would then determine whether she fell within the statutory policymaker exception to Title VII and the ADEA.

Both Title VII and the ADEA contain statutory exemptions for high-level policymakers. *See* 29 U.S.C. § 630(f) ("The term 'employee' shall not include any person elected to public office... or any person chosen by such officer to be on such officer's personal staff, *or an appointee on the policymaking level,* or an immediate advisor with respect to the exercise of the constitutional or legal powers of the office."); 42 U.S.C. § 2000e(f) (same) (emphasis added). Those exempt from the protections of Title VII and the ADEA are protected under the Civil Rights Act of 1991, 2 U.S.C. § 1201 *et seq.,* which requires a final determination by the EEOC appealable only to the United States Court of Appeals, *see* 2 U.S.C. § 1220(b)-(c); 28 U.S.C. §§ 2341–42; *McNulty v. New York City Dep't of Finance,* 941 F.Supp. 452, 457 (S.D.N.Y.1996). Accordingly if Ms. Butler is found to be a policymaker under these statutes, this Court would be without subject matter jurisdiction to adjudicate her claims.

While some Circuits have held that the First Amendment policymaker exception, and the Title VII/ADEA policymaker exceptions should be analyzed under the same standards, *see Americanos v. Carter,* 74 F.3d 138, 144 (7th Cir.1996), *cert. denied,* 517 U.S. 1222, 116 S.Ct. 1853, 134 L.Ed.2d 953 (1996), our Court of Appeals in its older cases, may have set a higher threshold for the Title VII/ADEA policymaker exception.

■ In order to be considered an "appointee on the policymaking level" Ms. Butler must have been appointed by an elected official. In *Tranello v. Frey,* 962 F.2d 244, 249 (2d Cir.1992) our Court of Appeals held that although the policymaking clause "does not contain clear language specifically stating

that an appointee must be directly appointed by an elected official to fall within section 630(f), the placement of [that] category in the middle of a statute primarily exempting elected officials from ADEA coverage strongly indicates that this provision must be read to require appointment by elected officials." Because Ms. Butler was appointed by then Attorney–General Robert Abrams (*See* Ex. J), an elected official, she meets this threshold.[5]

In *Equal Employment Opportunity Commission v. State of Vermont*, 904 F.2d 794, 800 (2d Cir.1990) our Court of Appeals held that "both the evolution of the exception and the direction that it be construed narrowly support our interpretation that by excluding appointees on the policymaking level, Congress meant to deny ADEA protection only to such appointees as would normally work closely with and be accountable to the official who appointed them." *See also Tranello*, 962 F.2d at 250 (reaffirming *Vermont*'s holding that "the language and structure of the definition of 'employee' suggest that Congress meant the policymaker category to comprise only policymakers working closely with the elected official"). While she was certainly accountable to him, no evidence has been presented to show that Ms. Butler worked closely with the prior Attorney General, and she never worked with the present incumbent. Any Assistant, especially a Bureau Chief, may from time to time be called upon to do so depending only on the fortuity of his or her current case load.[6] Potentially at least, Ms. Butler seems to fall within the policymaker exceptions to Title VII and the ADEA.

The holding in *Vermont* was based on the unique issue presented in that case, i.e. whether appointed state judges come within the protection of the ADEA.[7] The affirmative holding of our Court of Appeals on that issue was overruled thereafter by *Gregory v. Ashcroft*, 501 U.S. 452, 111 S.Ct. 2395, 115 L.Ed.2d 410 (1991). While *Tranello* reaffirmed the conclusions expressed in *Vermont* as to § 630(f), that portion of *Tranello* regarding the definition of a policymaker was dicta. The precise holding in *Tranello* was that "[b]ecause Tranello was appointed by another appointed official and not appointed by an elected official, his position as Deputy County Attorney does not fall within section 630(f), *regardless of whether the position was on a policymaking level.*" 962 F.2d at 249 (emphasis added). Because Ms. Butler was appointed directly by an elected official, the facts of her case are more favorable to applicability of the policymaker exemption than those of *Tranello*.

While the Court recognizes that the policymaker exception of Title VII/ADEA is to be narrowly construed, it seems logical that where, as here, plaintiff's job title makes her, in effect, an alter ego of the elected official, as a political appointee she should fall within the exception. High level personnel who appear for and help fulfill the duties of the elected official, and who, by virtue of their job titles could potentially be required to work closely with the elected official, regardless of whether they actually did or not, should fall within this exception.

In one of the first cases to test the scope of a similar exemption[8] in the ADEA permitting compulsory retirement for "bona fide executives" or "high policymaking" employ-

---

**5.** *See also* N.Y. Exec. Law § 62.

**6.** Mr. Vacco personally argued the case involving the constitutionality of New York's statute which made it a crime to aid a person in committing or attempting to commit suicide, *Vacco v. Quill*, —— U.S. ——, 117 S.Ct. 2293, 138 L.Ed.2d 834 (1997), before the Supreme Court of the United States. If that case, or one of similar magnitude, had been pending in Ms. Butler's bureau, undoubtedly she would have worked directly with the Attorney General.

**7.** The Court held that Vermont's appointed judges "do not advise [the governor] and are in

no way answerable to her ... The judges do not collaborate or work closely with the governor and cannot be deemed to be employed by her ... in our view, the performance of traditional judicial functions is not policymaking." *Vermont*, 904 F.2d at 800.

**8.** Section 631(c)(1) "Nothing in this chapter shall be construed to prohibit compulsory retirement of any employee who has attained 65 years of age and who, for the two year period immediately before retirement, is employed in a bona fide executive or high policymaking position."

**346**

ees, Judge Leval, then a district judge, held that the inherent duties of the job, rather than those actually performed, should control the policymaker determination. *Whittlesey v. Union Carbide Corp.*, 567 F.Supp. 1320, 1327 (S.D.N.Y.1983), *aff'd*, 742 F.2d 724 (2d Cir.1984).

> [I]f the organizational structure of the enterprise makes clear that the position in question has bona fide executive rank or serves a high policymaking function, courts probably should not allow the occupant to disavow the attributes of his position by seeking to prove, for example, that no one paid attention to his policy recommendations or followed his executive orders.

*Id.* This makes sense in light of the analogous holding in *Gordon* that job description rather than work performance controls the policymaker determination under the First Amendment. *Gordon*, 110 F.3d at 887 ("The idea that job performance (rather than job description) should control *Elrod–Branti* analysis has been consistently rejected by this Court and others.")

Inherent duties are most readily determined from an official job description or a statutory description. While there is no official job description for the position of Deputy Bureau Chief, Ms. Butler has described her job as follows:

> As one of two Deputy Bureau chiefs for the New York City Litigation Bureau, I help supervise over eighty attorneys. This work includes advising attorneys on how to proceed with litigation, assisting attorneys in court and reviewing and editing briefs and other court papers. I have various administrative duties, such as assigning new cases and preparing reports.

Ex. F

Concluding that Ms. Butler was a policymaker under these statutes is not to say that her civil rights should go unprotected, but rather that she must pursue any claims she may have under these statutes through the procedures provided in the Government Employees Civil Rights Act of 1991, 2 U.S.C. § 1201 *et seq.* (i.e. a final order from the EEOC with appeal to the Court of Appeals).

### III. State Law Claims

Ms. Butler's state law claims parallel the three federal claims in the complaint alleging political patronage and age and gender based discrimination under N.Y. Human Rights Law § 290 *et seq.* and N.Y. Const. Art. 1 § 8. Because her federal claims have been dismissed this Court declines to exercise supplemental jurisdiction over her state law claims pursuant to 28 U.S.C. § 1367(c)(3).

The Clerk shall file a final judgment.

SO ORDERED.