Evan COHN, Plaintiff,

v.

NEW PALTZ CENTRAL SCHOOL DISTRICT, et. al, Defendants.

No. 1:04–CV–1066 LEK DRH.

United States District Court, N.D. New York.

March 30, 2005.

Robert N. Isseks, Office of Robert N. Isseks, Middletown, NY, for Plaintiff.

Mark C. Rushfield, Shaw, Perelson Law Firm, Highland, NY, for Defendants.

## MEMORANDUM–DECISION AND ORDER [1]

KAHN, District Judge.

Plaintiff Evan Cohn commenced the instant action against Defendants claiming violations of rights, privileges, and immunities secured to Plaintiff by the First and Fourteenth Amendments of the United States Constitution. Presently before the Court is Defendants' motion for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c) seeking dismissal on the grounds that: (1) the Defendant New Paltz Central School District ("School District") is entitled to Eleventh Amendment immunity; (2) the Defendant Alan R. Derry ("Derry") is entitled to qualified immunity, and (3) Plaintiff's Due Process, First Amendment, and Equal Protection claims fail to state a cause of action on which relief may be granted. For the

1. For printed publication in the Federal Reporter.

following reasons, Defendants' motion in granted in part and denied in part.

## I. FACTUAL BACKGROUND

On March 1, 2001, Plaintiff's parents were notified by the School District that charges of misconduct were being brought against Plaintiff pursuant to New York State Education Law § 3214 including: (1) that in November 2000, Plaintiff had conspired in the high school cafeteria with two other New Paltz High School students to wrongfully possess and distribute one or more handguns; (2) that in December 2000 Plaintiff knowingly and wrongfully possessed one or more handguns at or near 686 Albany Post Road, New Paltz, New York, a location off school property; and (3) that upon receiving information that one or more handguns may be present in the New Paltz High School, administrators caused the high school to be evacuated, and that such conduct was in violation of the New Paltz Behavior Code prohibiting the possession of weapons or look-alike weapons and the distribution of unauthorized or illegal substances or materials and constituted the offense of insubordination. Complaint (Dkt. No. 1) at ¶ 6; Exhibit A.

Pursuant to the notice, a hearing was conducted in March and April 2001 by Defendant Derry to consider the charges of misconduct. *Id.* at ¶ 7. At the hearing, the School District called student "J.C.", who testified that in February 2001 he overheard students discussing guns, but did not identify the students or state whether the guns were at the school. *Id.* at ¶ 8. Another witness, who was acting as a hall monitor on the day in question, testified that J.C. had indicated to her that another student, B.G., was rumored to have taken handguns from his father and distributed them to other students. *Id.* at ¶ 9. The conversation between the hall monitor and J.C. did not divulge when the guns were taken or who was now in possession of them. *Id.* The Assistant Principal, James Grover, then testified that upon questioning "B.G.", he indicated that he had given handguns belonging to his father to Plaintiff and another student, "R.R.", but did not state where and when Plaintiff possessed the handgun. *Id.* at ¶ 10. New Paltz Police Chief Ralph Appa then testified that as a result of not knowing the exact whereabouts of Plaintiff and R.R., the school was put in lockdown. The handguns were not located on school grounds, and were eventually recovered off school property. *Id.* at ¶ 11. The School District's last witness was New Paltz Police Detective David Dugatkin, who introduced a written statement from B.G. *Id.* at ¶ 12. The statement states that in the school cafeteria sometime in November 2000, Plaintiff, B.G. and R.R. were discussing the handguns owned by B.G.'s father and that same day R.R. asked to borrow one. *Id.* Approximately a day or two later, Plaintiff did the same. *Id.* On some later weekend, Plaintiff went to B.G.'s house and obtained one of the handguns. The handgun was not returned to B.G. *Id.*

Following the close of the hearing, Defendant Derry rendered a decision on April 25, 2001 in which he held that "[t]he testimony of the police officers, the district administrator, the student and staff member, along with the documentary evidence, provided substantial, credible evidence on the record of [Plaintiff's] guilt of all charges stated in the notice of hearing." *Id.* at ¶ 20; Exhibit C. "Based upon the seriousness of the charges ... and based upon [Plaintiff's] prior record of discipline," Derry determined that the suspension of Plaintiff out of school for the remainder of the 2001 school year was appropriate. *Id.;* Exhibit C.

Following a June 1, 2001 decision by the School District's Board of Education to

adopt Derry's decision concerning the suspension of the Plaintiff from April 25, 2001 for the remainder of the school year, Plaintiff appealed the decision to the Commissioner of Education. *Id.* at ¶ 23.

In the June 19, 2002 decision by the Commissioner of Education, the Commissioner found that B.G.'s written statement should not have been introduced into evidence in lieu of B.G.'s live testimony. *Id.* at ¶ 24; Exhibit F. However, the Commissioner noted that hearsay evidence constituted admissible competent and substantial evidence to support a decision to suspend a student under New York Education Law § 3214. *Id.;* Exhibit F. He consequently found that Derry's admission of the written statement into evidence was harmless error because Derry had explicitly based his determination upon the testimony of the witnesses and documentary evidence "which included much more than just B.G.'s statement, and which is sufficient to sustain the charges." *Id.*

On or about October 16, 2002, Plaintiff commenced a proceeding in the Supreme Court for the State of New York, County of Albany under Article 78 of the New York Civil Practice Law & Rules to annul and void the decision of the Commissioner of Education dismissing Plaintiff's appeal from the action of the Board of Education which upheld the discipline of Plaintiff. Complaint (Dkt. No. 1) at ¶ 26. In his petition, Plaintiff contended that he was denied due process during the disciplinary proceeding and that the actions of Derry and the School District violated his First Amendment right to free speech and his Fourteenth Amendment right to equal protection. *Id.* at ¶ 27. By Memorandum and Judgment rendered on April 17, 2003, the state court found that the failure of Defendant Derry to call B.G. as a witness, while introducing in evidence B.G.'s written statement, "effectively denied [Plaintiff] his right to a fair hearing which includes the right to cross-examine witnesses against him (Education Law § 3214(3)(c)(1))." *Id.* at ¶ 28. Without B.G.'s written statement, the state court found that the hearing testimony contained "absolutely no evidence whatsoever as to any conversation between B.G. and [Plaintiff] about guns or anything else taking place in the New Paltz High School Cafeteria in November 2000." *Id.* Therefore the state court concluded that the Commissioner of Education's findings and conclusions were "arbitrary and capricious" and "lacked a rational basis", vacating and annulling the Commissioner of Education's decision and ordering that both Derry's determination and that of the Board of Education concerning Plaintiff's discipline be expunged from his record. *Id.*

On September 18, 2004, Plaintiff commenced this action seeking to recover compensatory and punitive damages pursuant to 42 U.S.C. § 1983 to redress the deprivation, under color of state law, of rights, privileges and immunities secured to Plaintiff under the First and Fourteenth Amendments of the United States Constitution. Complaint (Dkt. No. 1).

Defendants' motion for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c) seeks dismissal on the grounds that: (1) the Defendant School District and Defendant Derry in his official capacity are entitled to Eleventh Amendment immunity; (2) the Defendant Derry in his individual capacity is entitled to qualified immunity, and (3) Plaintiff has failed to state a cause of action as to his Due Process, First Amendment, and Equal Protection claims.[2] Def. Motion (Dkt. No. 8).

---

**2.** Plaintiff's Fourth Claim challenges the School District's Behavior Code as being

## II. STANDARD OF REVIEW

Defendants' motion to dismiss the complaint, having been made following the close of pleadings, is properly viewed as a motion for judgment on the pleadings under Federal Rule of Civil Procedure 12(c). *See* CHARLES A. WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE & PROCEDURE § 1367, at 514 (2d ed.1990). Nevertheless, in resolving that motion, the Court must "apply the same standards ... as it would have employed had the motion been brought under Rules 12(b)(1), (6), or (7) ...." *Id.* at 515.

When deciding a Rule 12(b)(6) motion to dismiss for failure to state a claim, the Court must accept as true all factual allegations made in the complaint and draw all reasonable inferences in favor of the plaintiff. *See Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 164, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993); *Harris v. City of New York*, 186 F.3d 243, 247 (2d Cir.1999); *Bolt Elec. v. City of New York*, 53 F.3d 465, 469 (2d Cir.1995). The court may grant the motion only when "it appears beyond doubt ... that the plaintiff can prove no set of facts [in support of his claim] which would entitle him to relief." *Sec. Investor Prot. Corp. v. BDO Seidman, LLP*, 222 F.3d 63, 68 (2d Cir.2000) (quoting *Jaghory v. New York State Dep't of Educ.*, 131 F.3d 326, 329 (2d Cir.1997)). The issue is not whether the plaintiff will ultimately prevail but whether the plaintiff is entitled to offer evidence to support the claims. *Villager Pond, Inc. v. Town of Darien*, 56 F.3d 375, 378 (2d Cir.1995).

Defendants contend that the Court lacks subject matter jurisdiction because of the School District's Eleventh Amendment immunity. Def. Memo (Dkt. No. 8)

at 2. A motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1) is governed by the same aforementioned standards for Rule 12(b)(6). *Sweet v. Sheahan*, 235 F.3d 80, 83 (2d Cir.2000).

## III. DISCUSSION

### A. Eleventh Amendment Immunity

■ Defendants claim that, in New York, a school district is an arm of the state entitled to Eleventh Amendment immunity from suit in federal court. In support, Defendants claim that school districts satisfy the six factor test set forth in *McGinty v. New York*, 251 F.3d 84 (2d Cir.2001). Defendants also cite to various decisions from the District Court for the Southern District of New York, one of which was affirmed by the Second Circuit in an unpublished decision. *Scaglione v. Mamaroneck Union Free Sch. Dist.*, 47 Fed.Appx. 17, 2002 WL 31060608 (2d Cir. 2002). In opposition, Plaintiff argues that the Supreme Court's decision in *Mount Healthy Bd. of Educ. v. Doyle*, 429 U.S. 274, 280–81, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977), the Second Circuit's decision in *Fay v. South Colonie Sch. Dist.*, 802 F.2d 21 (2d Cir.1986), and an analysis of the *McGinty* factors compels a finding that the School District is not entitled to Eleventh Amendment immunity.

In *Scaglione v. Mamaroneck Union Free Sch. Dist.*, 47 Fed.Appx. 17, 2002 WL 31060608 (2d Cir.2002), the Second Circuit held that the defendant school district was entitled to Eleventh Amendment immunity. In that unpublished opinion, the Second Circuit provided little discussion of the issue and did not address its previous decision in *Fay*, which found that a school

vague and overly broad. Complaint (Dkt. No. 1) at ¶ 39. As Defendants have not discussed this claim in their Motion for Judgment on

the Pleadings, this Court will not address the Fourth Claim in this Decision.

district is *not* entitled to Eleventh Amendment immunity. This seeming anomaly between *Scaglione* and *Fay* need not give the Court pause because, pursuant to Second Circuit rules, *Scaglione* "MAY NOT BE CITED AS PRECEDENTIAL AUTHORITY TO THIS OR ANY OTHER COURT." *Scaglione,* 47 Fed.Appx. at 19, 2002 WL 31060608; U.S.Ct. of App.2d Cir. R. 0.23 ("Since these [summary orders] do not constitute formal opinions of the court and are unreported or not uniformly available to all parties, they shall not be cited or otherwise used in unrelated cases before this or any other court."). Thus, the Second Circuit's decision in *Scaglione* has no authority (binding or persuasive) in this case.

That leaves us with *Fay,* in which the Second Circuit noted that a school district is not entitled to Eleventh Amendment immunity because there was no evidence that: (1) payment of monetary damages would come from the state treasury; and (2) school districts are the alter ego for the state. 802 F.2d at 27. *Fay* has been overruled in part, *see Taylor v. Vermont Dep't of Ed.,* 313 F.3d 768 (2d Cir.2002), but not on the issue of Eleventh Amendment immunity. Defendants have not pointed to, and the Court has been unable to locate, any cases overruling *Fay* on the Eleventh Amendment issue. In fact, the principles of *Fay* were reaffirmed by *Rosa R. v. Connelly,* 889 F.2d 435 (2d Cir.1989), wherein the Second Circuit held that, under Connecticut law, local boards of education are not entitled to Eleventh Amendment immunity. This Court is bound by the decision in *Fay* and, accordingly, finds that the Defendant School District is not

entitled to Eleventh Amendment immunity.

■ This conclusion is supported by the application of the six factor test articulated in *McGinty* and a review of the New York State Education Law. The six factors used in determining whether an entity is an arm of the state are: (1) how the entity is identified in its documents of origin; (2) how the governing members of the entity are appointed; (3) how the entity is funded; (4) whether the entity's function is traditionally one of local or state government; (5) whether the state has a veto power over the entity's actions; and (6) whether the entity's financial obligations are binding on the state. *McGinty,* 251 F.3d at 95–96. "If these factors point in one direction, the inquiry is complete. If not, a court must ask whether a suit against the entity in federal court would threaten the integrity of the state and expose its treasury to risk." *Id.*

### i. *How The Entity Is Identified In Its Documents Of Origin*

Pursuant to New York Education Law §§ 1701 and 1804, "[t]he board of education . . . is hereby created a body corporate." [3] Article X, § 5 of the New York State Constitution essentially contemplates school districts as public corporations. N.Y. CONST. art. X, § 5 ("No public corporation (other than a county, city, town, village, *school district* . . . .))." By lumping school districts with other public corporations, such as counties, cities, towns, and villages, it becomes clear that school districts should be viewed in the same light as these other entities. Of course, counties, cities, towns and villages do not enjoy Eleventh Amendment immu-

---

**3.** This quotation is from § 1701, which applies to union free school districts. Section 1804, however, provides that "[e]xcept as provided in this article, all the provisions of this chapter or of any other general law relating to or affecting union free school districts shall apply to central districts . . . ."

nity. The same result should apply to school districts.

The Second Circuit has noted that delineating an entity as a "public corporation" "is of little help in determining whether an entity is an arm of the state." *McGinty*, 251 F.3d at 96. Thus, New York case law should be reviewed for clarification. *Id.* The New York courts have held that, akin to municipalities, school districts in New York are subdivisions of the state. *See Bd. of Educ. of Roosevelt Union Free Sch. Dist. v. Bd. of Trustees of the State Univ. of New York*, 282 A.D.2d 166, 172, 723 N.Y.S.2d 262 (3d Dep't 2001). In *Jeter v. Ellenville Central Sch. Dist.*, 41 N.Y.2d 283, 287, 392 N.Y.S.2d 403, 360 N.E.2d 1086 (1977), the New York Court of Appeals referred to the New York City Board of Education as a "unit[ ] of municipal government."

Defendants cite to *Lanza v. Wagner*, 11 N.Y.2d 317, 326, 229 N.Y.S.2d 380, 183 N.E.2d 670 (1962) for the proposition that school boards are agencies of the state. In *Lanza*, the New York Court of Appeals stated that:

> Although members of a Board of Education in a city perform tasks generally regarded as connected with local government, they are officers of an independent corporation separate and distinct from the city, created by the State for the purpose of carrying out a purely State function and are not city officers within the compass of the Constitution's home rule provisions.... "If there be one public policy well-established in this State", this court declared in *Matter of Divisich v. Marshall* (281 N.Y. 170, 173, 22 N.E.2d 327 (1939), supra.), "it is that public education shall be beyond control by municipalities and politics. The Board of Education of the City of New York is not a department of the city

> government, it is an independent corporate body."

*Id.*

This statement supports the finding that school boards are not entitled to Eleventh Amendment immunity. Distilled to its essence (and particularly when read together with *Jeter*), *Lanza* is saying that: (1) school board members perform tasks associated with local government, but (2) school boards are an "independent corporation" separate and apart from a particular municipality. What this means, in effect, is that, like municipalities, school boards are their own entities. As in *Mount Healthy*, 429 U.S. at 280, 97 S.Ct. 568, "a local school board like [Defendant School District] is more like a county or city than it is like an arm of the State." Municipalities, as subdivisions of the state, do not enjoy Eleventh Amendment immunity and neither do local school boards, which also are subdivisions of the state.

Indeed, the Commissioner of the New York State Department of Education is "authorized and empowered to lay out central school districts for the establishment of central schools." N.Y. EDUC. LAW § 1801(1). However, while the Commissioner does have this authority, such powers are ineffective "until it has been organized by the qualified voters of the district." *Id.* at § 1801(4); N.Y. EDUC. LAW § 1802 (requiring petition of qualified voters to establish a new central school district). Thus, the ultimate authority for creating a school district lies at the local level.

Considering that school districts are treated by state law as being akin to municipalities and that the ultimate authority to establish a school district lies at the local level, the Court finds that this first factor weighs against application of Eleventh Amendment immunity.

### ii. *How The Governing Members Of The Entity Are Appointed*

Pursuant to § 1804 of the Education Law, "[e]ach such central school district shall be managed by a board of education." The members of the board of education are locally elected. *Id.* Thus, this factor also weighs against affording the School District Eleventh Amendment immunity.

### iii. *How The Entity Is Funded*

Although school districts receive aid from the state, they are funded locally. For example, school districts have the duty to raise the moneys required to pay teachers' salaries. N.Y. EDUC. LAW § 1709(20). The budgets of central school districts are determined on a local basis. N.Y. EDUC. LAW § 1804(4) ("The board of education ... shall hold a budget hearing ... and shall prepare and present to the voters at such budget hearing a proposed school district budget."). Just because school districts may receive financial assistance from the state does not automatically transform them into an arm of the state. *Fay*, 802 F.2d at 27; *Rosa R.*, 889 F.2d at 437 ("Although local boards receive much of their financing from the state, 'inferior government bodies do not share in Eleventh Amendment immunity simply because they receive state funds.'") (quoting *Fay*, 802 F.2d at 27). The Court finds that this factor weighs against Eleventh Amendment immunity.

### iv. *Whether The Entity's Function Is Traditionally One Of Local Or State Government*

The fourth factor does not decidedly point one way or another. Arguably, *Lanza* stands for the proposition that education is a state function. *Lanza*, 11 N.Y.2d at 326, 229 N.Y.S.2d 380, 183 N.E.2d 670 ("[M]embers of a Board of Education ... are officers of an independent corporation separate and distinct from the city, created by the State for the purpose of carrying out a purely State function ...."). Indeed, the obligation to provide a public education is imposed upon the state pursuant to the New York State Constitution. N.Y. CONST. art. XI, § 1.

Looking back through history, however, it appears that education traditionally was a *local* function. *See Reform Educ. Fin. Inequities Today v. Cuomo*, 86 N.Y.2d 279, 284, 631 N.Y.S.2d 551, 655 N.E.2d 647 (1995);[4] *Paynter ex rel. Stone v. State*, 290 A.D.2d 95, 99, 735 N.Y.S.2d 337 (4th Dep't 2001) ("By 1894, there were 11,778 local school districts ... each of which was required by State law to provide a free education 'to all persons over five and under twenty-one years of age residing in the district.'") (quoting L. 1881, ch. 528, § 3);

---

**4.** The *Reform Educational Financing Inequities Today* Court gave the following historical analysis of the purpose of art. XI, § 1 of the New York Constitution:

"[T]he evident purpose of [the Education Article] was to deprive the legislature of discretion in relation to the establishment and maintenance of common schools, and to impose on that body the absolute duty to provide a general system of common schools" (3 Lincoln, Constitutional History of New York, at 554). Thus, the primary aim of the legislation was to constitutionalize the established system of common schools rather than to alter its substance (see, e.g., Report of Comm on Education and Funds Pertaining Thereto, 2 Documents of N.Y. Constitutional Convention of 1894, Doc No. 62, at 3; *Judd v. Board of Educ.*, 278 N.Y. 200, 210, 15 N.E.2d 576). That system consisted of 11,778 local school districts with varying amounts of property wealth which offered significantly disparate educational opportunities (Fortieth Ann. Report of State Superintendent of Public Instruction, 6 N.Y. Assembly Documents of 1894, Doc No. 42, at 76–83, 88–95).

*Reform Educ. Fin. Inequities Today*, 86 N.Y.2d at 284, 631 N.Y.S.2d 551, 655 N.E.2d 647.

*Campaign for Fiscal Equity, Inc. v. State,*
86 N.Y.2d 307, 320, 631 N.Y.S.2d 565, 655
N.E.2d 661 (1995) (noting state interest in
*preserving* and promoting local control of
education). As discussed in *Reform Edu-
cational Financing Inequities Today,* Ar-
ticle XI, § 1 of the New York Constitution
was adopted to ensure that responsibility
for the provisions of public education was
placed on the state; not elsewhere. Thus,
the Court finds that, traditionally, edu-
cation was not a state function and this
factor, too, points against Eleventh
Amendment immunity.

### v. *Whether The State Has A Veto Power Over The Entity's Actions*

This fifth factor is somewhat mixed, but,
on balance, weighs against Eleventh
Amendment immunity. It is clear that the
Commissioner has some review power to
review the decisions of local boards of
education. For example, the Commission-
er can remove board members, superinten-
dents, or other school officers for cause.
*See* N.Y. EDUC. LAW §§ 306, 1706. Simi-
larly, the Commissioner can withhold
funds from school districts under certain
circumstances. N.Y. EDUC. LAW § 306.
The Commissioner is charged with general
supervision over schools. N.Y. EDUC. LAW
§ 305(2). The Commissioner also reviews
petitions by "[a]ny party conceiving him-
self aggrieved." N.Y. EDUC. LAW § 310.

The Commissioner's power, however, is
constrained and does not extend over all
decisions. Local school boards exercise
substantial discretion in the day-to-day
management of the school districts without
input or veto power by the Commissioner.
Upon review of the Education Law, it ap-
pears that the school district, and the
school district alone, has the authority and
the duty to (1) adopt their own by-laws;
(2) establish their own rules and regula-
tions concerning order and discipline in the

schools; (3) prescribe the course of study
by which students are graded and classi-
fied; (4) prescribe the textbooks to be
used; (5) purchase or lease sites for
school-related purposes; (6) take charge
and possession of the schoolhouses, sites,
lots, furniture, books, apparatus, and all
school property within its district; (7) con-
tract with and employ teachers; (8) deter-
mine the number of teachers so employed;
(8) remove board members for misconduct;
(9) raise by tax moneys required to pay
teachers' salaries; etc. N.Y. EDUC. LAW
§ 1709. These, and other, provisions of
the New York Education Law make it
clear that substantial authority over local
central school districts is vested at the
local level; not the state level. *See Rosa
R.*, 889 F.2d at 437 ("Although the state
board of education is charged with general
supervision and control of the educational
interests of the state, being a steward of
state education policy does not make the
school district an alter ego of the state.
This is true ... where actual implementa-
tion of the goals and maintenance of the
public schools are the responsibilities of
local boards whose members are chosen by
municipal election.") (internal quotations
and citations omitted). To the extent the
Commissioner has review authority, N.Y.
EDUC. LAW § 310, the Court believes there
to be a fundamental difference between
having the power of review upon petition
and having a veto power. The Court has
been unable to locate any authority where-
by the Commissioner can, on his or her
own, review decisions by school districts
and reject them. Rather, the Commission-
er only has authority when matters are
properly presented to him or her.

In short, this factor does not decidedly
point towards the inapplicability of the
Eleventh Amendment, but that it does
weigh against such immunity.

### vi. *Whether The Entity's Financial Obligations Are Binding On The State*

This sixth factor is, perhaps, the most important. *McGinty*, 251 F.3d at 100. "The relevant question with respect to this sixth factor is 'whether a judgment against the [School District] would have the practical effect of requiring payment from New York.'" *McGinty*, 251 F.3d at 99 (quoting *Mancuso v. New York State Thruway Auth.*, 86 F.3d 289, 296 (2d Cir.1996)). The sixth factor strongly weighs against finding Eleventh Amendment immunity.

Pursuant to the Education Law, local school boards "shall have power, and it shall be its duty" to "pay any judgments levied against the school district and in the event there are no moneys otherwise available, ... levy a tax upon the taxable property of the district to pay the same." N.Y. EDUC. LAW § 1709(26). In further support of the conclusion that the state is not liable for the actions of school boards, Article X, § 5 of the New York State Constitution expressly provides that "[n]either the state nor any political subdivision thereof shall at any time be liable for the payment of any obligations issued by such a public corporation." Defendants have presented the Court with no authority for the proposition that the State of New York bears any responsibility for judgments against the School District.

In conclusion, the Court finds that application of these factors point in one direction—that the School District is not entitled to Eleventh Amendment immunity. To the extent that application of these factors is not conclusive, for the reasons previously articulated, it is clear that "a suit against the [school district] in federal court would [not] threaten the integrity of the state and expose its treasury to risk," and, therefore, is not entitled to Eleventh Amendment immunity. *McGinty*, 251 F.3d at 96.

### B. Qualified Immunity

Defendant Derry has pled qualified immunity as to all the claims asserted against him. Def. Memo. (Dkt. No. 8) at 14. Qualified immunity is available only when a § 1983 suit is brought against a state official in his individual capacity, making him personally liable for any damages awarded to the plaintiff. This immunity is not a defense where the defendant is a state or municipality or is a public employee in his official capacity, which is in essence a suit against the defendant's governmental employer because the employer must pay any damages awarded. *See Kentucky v. Graham*, 473 U.S. 159, 165–67, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985).

The Second Circuit Court of Appeals has held, "[o]nce qualified immunity is pleaded, plaintiff's complaint will be dismissed unless defendant's alleged conduct, when committed, violated 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Williams v. Smith*, 781 F.2d 319, 322 (2d Cir.1986) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). Qualified immunity "provides ample protection to all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1976).

In deciding whether a state official is entitled to qualified immunity, it must first be determined whether a plaintiff successfully alleged facts showing the violation of a constitutional right by state officials, and whether there is a genuine issue of material fact that the violation occurred. *Saucier v. Katz*, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). "If there is no constitutional violation, our inquiry

ends." *Mace v. City of Palestine,* 333 F.3d 621, 623 (5th Cir.2003).

If the Plaintiff's alleged facts make out a constitutional violation, it is then asked whether the right allegedly violated was "clearly established," meaning that "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). Even if the right was clearly established at the time of the alleged violation, however, a defendant will still be entitled to qualified immunity if the defendant's conduct was objectively reasonable in light of clearly established law at the time of the violation. *Siegert v. Gilley,* 500 U.S. 226, 231–32, 111 S.Ct. 1789, 114 L.Ed.2d 277 (1991). The Court must now examine if Plaintiff has alleged facts that make out a constitutional violation and in doing so determine whether Plaintiff has stated a valid cause of action. If Plaintiff has pleaded a valid cause of action, a determination will be made as to whether Defendant Derry's conduct was objectively reasonable in light of the clearly established law.

### i. Procedural Due Process

The Fourteenth Amendment to the United States Constitution prohibits the state from depriving a person of life, liberty, or property without due process of law. U.S. Const. amend. XIV, § 1. In Plaintiff's first claim, he contends that Defendant Derry's consideration of B.G.'s written statements in his April 25, 2001 decision without providing Plaintiff an opportunity to cross-examine B.G., especially in light of the fact that B.G.'s statements constituted the only evidence directly implicating Plaintiff, denied him a fair hearing and violated his procedural due process rights under the Fourteenth

Amendment. Complaint (Dkt. No. 1) at ¶ 31; Plaintiff's Memo. (Dkt. No. 15) at 22. In Plaintiff's second claim, he contends that the School District violated his due process rights by adopting Defendant Derry's decision in its June 1, 2001 resolution without sufficient evidence. Complaint (Dkt. No. 1) at ¶ 33.

■ In any procedural due process claim, the initial inquiry should always be whether a property interest or right exists. The Supreme Court in *Board of Regents v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972), held that property interests derive from state law. Article XI, Section 1 of the New York Constitution declares that the State shall provide children with a free public education. N.Y. Const. art. XI, § 1; *see also* N.Y. Educ. Law § 3202(1). Thus, in New York, a student such as Plaintiff has a protected property interest in his education, meaning that he could not have been deprived of that right without due process of law. *Pollnow v. Glennon,* 594 F.Supp. 220, 223 (S.D.N.Y.1984).

The extent of due process required is also a relevant factor that must be resolved by the Court. New York Educational Law mandates that:

> [n]o pupil may be suspended for a period in excess of five school days unless such pupil and the person in parental relation to such pupil shall have had an opportunity for a fair hearing, upon reasonable notice, at which such pupil shall have the right of representation by counsel, with the right to question witnesses against such pupil and to present witnesses and other evidence on his behalf.

N.Y. Educ. Law § 3214(3)(c)(1).

■ But a violation of state law is not a recognizable claim under 42 U.S.C. § 1983. Plaintiff must allege a violation of a federal constitutional or statutory right to recover

under 42 U.S.C. § 1983. *Pollnow v. Glennon*, 757 F.2d 496, 501 (2d Cir.1985) (citing *Davis v. Scherer*, 468 U.S. 183, 104 S.Ct. 3012, 82 L.Ed.2d 139 (1984)).

In *Goss v. Lopez*, 419 U.S. 565, 573, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975), the Supreme Court held that students facing a ten-day suspension must be given some kind of notice and afforded some type of hearing. *Id.* at 579, 95 S.Ct. 729. The Court stated that the hearing could be held immediately following the incident and be informal. However, the Supreme Court did caution "suspensions or expulsions for the remainder of the school term, or permanently, may require more formal procedures." *Id.* at 584, 95 S.Ct. 729.

■ Constitutionally, due process "requires that individuals have 'notice and opportunity for a hearing appropriate to the nature of the case' prior to a deprivation of life, liberty, or property." *Rosa R. v. Connelly*, 889 F.2d 435, 438 (2d Cir. 1989) (quoting *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 313, 70 S.Ct. 652, 94 L.Ed. 865 (1950)). "Notice must be 'reasonably calculated, under all the circumstances, to appraise interested parties of the pendency of the action and afford them an opportunity to present their objections.' " *Id.* at 439 (quoting *Mullane*, 339 U.S. at 314, 70 S.Ct. 652).

Defendants also contend that it is well established in the context of disciplinary proceedings that post-discipline due process provides sufficient due process to satisfy the requirements of the Fourteenth Amendment. Def. Memo. (Dkt. No. 8) at 18. In *Giglio v. Dunn*, 732 F.2d 1133, 1135 (2d Cir.1998), the Second Circuit noted that "due process requires only that a hearing be held at a meaningful time and in a meaningful manner," and that "[w]here a pre-deprivation hearing is impractical and a post-deprivation hearing is meaningful, the state satisfies its constitu-

tional obligations by providing the latter." *Id.* at 1135. The court found that an Article 78 proceeding is such a meaningful opportunity. *Id.; See also Richardson v. Capt. Van Dusen*, 833 F.Supp. 146, 153 (N.D.N.Y.1993) (McAvoy, C.J.) ("[E]ven when assuming that the Superintendent's Hearing was conducted in [a] manner that deprived plaintiff of his due process rights, the process afforded the plaintiff in the Article 78 proceeding cured any defect in the original hearing."); *Monroe v. Schenectady County*, 1 F.Supp.2d 168, 172 (N.D.N.Y.1997) (McAvoy, C.J.) (finding that an Article 78 proceeding provides an adequate post-deprivation remedy and constituted "all the process plaintiff was due."); *Gudema v. Nassau County*, 163 F.3d 717, 724 (2d Cir.1998).

■ In this case, there is no dispute that Plaintiff received notice of the charges and the hearing date on March 1, 2001 and that a disciplinary hearing was held on March 30, 2001, April 5, 2001, and April 23, 2001. Complaint (Dkt. No. 1) at ¶¶ 6, 7. Plaintiff then outlined the errors made by Defendant Derry in his appeals before the Board of Education and the Commissioner of Education. *Id.* at ¶¶ 21, 23; Exhibit D; Exhibit E. Finally, Plaintiff successfully vacated the disciplinary decision to which he objected by way of his Article 78 proceeding before the State Supreme Court. *Id.* at ¶¶ at 28, 29. To prevail under a procedural due process claim, plaintiff must show that the "procedural safeguards ... established by the state are insufficient to protect [their] rights." *Moccio v. New York State Office of Court Admin.*, 95 F.3d 195, 200 (2d Cir.1996) (quoting *Valmonte v. Bane*, 18 F.3d 992, 1002 (2d Cir.1994)). Here, Plaintiff has fully utilized the procedural safeguards provided to ultimately vacate the incorrect disciplinary decision. The Article 78 proceeding constituted part of the due process protec-

tion he received, and it cured any procedural defect that may have occurred. Therefore, Plaintiff has failed to state a cause of action for violation of his procedural due process rights under the Fourteenth Amendment.

### ii. Substantive Due Process

 Substantive due process has been characterized as imposing limits on what a state may do regardless of what procedural protection is provided. It is well settled that plaintiffs may only allege cognizable substantive due process claims for extreme or egregious conduct which can be fairly viewed as so "brutal" and "offensive to human dignity" that it shocks the conscience. *Johnson v. Glick*, 481 F.2d 1028, 1033 n. 6 (2d Cir.1973) (citing *Rochin v. California*, 342 U.S. 165, 172, 72 S.Ct. 205, 96 L.Ed. 183 (1952)). The Second Circuit has explained that "substantive due process protects against governmental action that is arbitrary, conscience shocking, or oppressive in a constitutional sense, but not against government action that is incorrect or ill-advised." *Lowrance v. Achtyl*, 20 F.3d 529, 537 (2d Cir.1994) (citations omitted). Substantive due process "does not forbid governmental actions that might fairly be deemed arbitrary or capricious and for that reason correctable in a state court lawsuit .... [Its] standards are violated only by conduct that is so outrageously arbitrary as to constitute a gross abuse of governmental authority." *Harlen Assocs. v. Vil. of Mineola*, 273 F.3d 494, 505 (2d Cir.2001) (quoting *Natale v. Town of Ridgefield*, 170 F.3d 258, 263 (2d Cir. 1999)).

The Supreme Court has addressed school discipline cases and commented that, "[i]t is not the role of the federal courts to set aside decisions of school administrators which the court may view as lacking a basis in wisdom or compassion

.... § 1983 does not extend the right to relitigate in federal court evidentiary questions arising in school disciplinary proceedings or the proper construction of school regulations." *Wood v. Strickland*, 420 U.S. 308, 326, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975); *see also Bd. of Educ. v. McCluskey*, 458 U.S. 966, 102 S.Ct. 3469, 73 L.Ed.2d 1273 (1982).

 Plaintiff contends that even if Defendant Derry did consider the written statement of B.G. in making his decision, the record is still devoid of any rational basis for disciplining Plaintiff, and therefore Defendant Derry, and Defendant School District by adopting Derry's decision, violated Plaintiff's substantive due process rights. Plaintiff's Memo. (Dkt. No. 15) at 22.

The Court finds that Defendants' conclusion that Plaintiff's conversing with fellow students about handguns and subsequently obtaining possession of a handgun constituted a "material and substantial disruption of the educational process" worthy of suspension does not shock the conscience. Given that Defendants are responsible for providing a safe and stable learning environment free of distraction and fear and the seriousness of the conduct Plaintiff engaged in, Defendants' overly broad reading of the school district's behavior code, while maybe regrettable, does not constitute a violation of Plaintiff's substantive due process rights. We cannot say that Defendants transgressed the "outer limit" of legitimate governmental action, and therefore, their actions do not give rise to a federal substantive due process claims. *Natale v. Town of Ridgefield*, 170 F.3d 258, 263 (2d Cir.1999).

As a result of the Court's determination that Plaintiff has failed to state a cause of action for a violation of either his procedural due process or substantive due process rights, Plaintiff's first and second

claims alleging due process violations in the April 25, 2001 Decision of Defendant Derry and the June 1, 2001 Decision of the Board of Education are dismissed as to all Defendants.

### C. First Amendment

Plaintiff contends that Defendants violated his First Amendment right to free speech by punishing him for his involvement in a conversation where "there was like talk about guns" without demonstrating that such conduct "materially and substantially interfered with the requirements of appropriate discipline in the operation of the school or that such conduct would have substantially disrupted or interfered with the work of the school or the rights of other students." Complaint (Dkt. No. 1) at ¶¶ 35, 36. Defendants contend that the conversation did constitute a substantial and material interference with the school's operation, or alternatively, constituted a true threat and therefore is not protected speech under the First Amendment.

The first step in establishing a First Amendment violation is determining whether the plaintiff's speech is protected under the Constitution. While the Supreme Court has made it clear that public school students do not shed their constitutional rights "at the schoolhouse gate," *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969), it has also established that a student's rights "are not automatically coextensive with the rights of adults in other settings." *Bethel Sch. Dist. v. Fraser*, 478 U.S. 675, 682, 106 S.Ct. 3159, 92 L.Ed.2d 549 (1986).

The Supreme Court has decided several cases establishing the framework within which to evaluate the First Amendment claims of public school students. In *Tinker*, the Supreme Court found that school officials have the authority to limit, restrict or punish speech that "would materially and substantially interfere with the requirements of appropriate discipline in the operation of the school or that such conduct would have substantially disrupted or interfered with the work of the school or the rights of other students." *Tinker*, 393 U.S. at 508, 89 S.Ct. 733. In *Fraser*, the Court found that a school may categorically prohibit lewd, vulgar or profane language on school property. *Fraser*, 478 U.S. at 682, 106 S.Ct. 3159. In *Hazelwood*, the Court found that a school may regulate school-sponsored speech on the basis of any legitimate pedagogical concern. *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 273, 108 S.Ct. 562, 98 L.Ed.2d 592 (1988). Courts have also utilized the finding of the Supreme Court that threats are not protected speech to justify the disciplining of students. *Lovell v. Poway Unified Sch. Dist.*, 90 F.3d 367, 372 (9th Cir.1996) (citing *Watts v. United States*, 394 U.S. 705, 89 S.Ct. 1399, 22 L.Ed.2d 664 (1969)). Defendants do not suggest nor does the Court find that Plaintiff's speech qualifies as lewd or vulgar under *Fraser* or is school-sponsored under *Hazelwood*.

██ The Court finds that Plaintiff's conduct did not constitute a "true threat" under *Watts v. United States*, 394 U.S. 705, 89 S.Ct. 1399, 22 L.Ed.2d 664 (1969). In distinguishing an unprotected threat from protected speech, courts have focused on whether a reasonable person would interpret the alleged threat as a serious expression of an intent to cause a present or future harm. *See United States v. Abdel-Jabbor Malik*, 16 F.3d 45, 49 (2d Cir. 1994); *Lovell v. Poway Unified Sch. Dist.*, 90 F.3d 367, 372 (9th Cir.1996) (upholding the suspension of student who threatened her guidance counselor with physical violence and finding that such a threat was not protected speech under the First

Amendment); *J.S., a Minor v. Bethlehem Area Sch. Dist.*, 757 A.2d 412, 422 (Pa. Cmwlth.2000) (upholding the suspension of student who solicited funds to have a teacher killed on his web page). Defendants do not point to any written or verbal statement by Plaintiff that constitutes a threat, but instead claim that Plaintiff's actions and statements in the school's cafeteria in November 2000 constituted a conspiracy to obtain possession of stolen handguns and threatened the safety of the school, and therefore Plaintiff's statements are not entitled to First Amendment protection. Def. Memo. (Dkt. No. 8) at 21. This Court does not conclude that Plaintiff's discussion concerning handguns constituted a threat. Plaintiff did not direct speech or action towards another individual that constituted a serious expression of an intent to cause harm.

Under *Tinker*, in order to suppress speech that is constitutionally protected, the defendant must justify its decision by showing "facts which might reasonably have led school authorities to forecast substantial disruption of or material interference with school activities." *Tinker*, 393 U.S. at 514, 89 S.Ct. 733.

Important to this determination is Defendants' contention that Plaintiff's speech in school was not the only basis of his suspension, and that his suspension was also based on his taking possession of the handgun, albeit off-campus. Def. Memo. (Dkt. No. 8). In the March 1, 2001 hearing notice and April 25, 2001 decision of Defendant Derry, Plaintiff was also charged with misconduct in that "on or about or between November, 2000 and December, 2000, knowingly and wrongfully possess[ed] one or more handguns." Complaint (Dkt. No. 1) at ¶¶ 6, 20.

There is support for Defendants' contention that public school students can be subject to discipline for conduct that takes place off school grounds. *See Pollnow v. Glennon*, 594 F.Supp. 220, 224 (S.D.N.Y. 1984) (upholding suspension of student who assaulted someone off school property while under the influence of drugs); *Caldwell v. Cannady*, 340 F.Supp. 835, 838 (N.D.Tex.1972) (upholding suspension of students for possession of drugs off school property); *Howard v. Colonial Sch. Dist.*, 621 A.2d 362, 366 (Del.Super.1992) (upholding suspension of student for selling drugs off school property); *Matter of Rodriguez*, 8 Ed. Dept. Rep. 214, 216–17. In *Rodriguez*, the New York State Commissioner of Education stated that it was immaterial that the disciplinary action against the student originated from acts allegedly committed away from school property. Because it is the duty of the school district to protect the education system which it runs, it is within its discretion to punish conduct occurring outside the school situation, so long as there exists a nexus between the behavior and the school. The simple fact that conduct occurs off school grounds "does not preclude the possibility that such conduct ... may adversely affect the educative process or endanger the health, safety or morals for pupils within the education system for which the school authorities are responsible." *Rodriguez*, 8 Ed. Dept. Rep. at 216.

Defendants state that Plaintiff's speech and action "threatened the health, safety and welfare of staff and students at the New Paltz High School" in both its March 1, 2001 notice and its April 25, 2001 decision, but it is not clear on what factual basis that conclusion is based. Witness J.C. testified that in February 2001, he overheard students discussing guns, but did not identify the students or state whether the guns were at the school or that the guns were sold. Complaint (Dkt. No. 1) at ¶ 8. In the written statement of B.G., he indicates that Plaintiff, R.R., and

B.G. discussed guns in the school cafeteria in November 2000, but does not indicate that the students were on-campus when R.R. or Plaintiff asked to borrow the handguns. *Id.* at ¶ 12. Also, in B.G.'s written statement, he states that he provided a handgun to Plaintiff, but does not indicate any facts that demonstrate a clear and substantial disruption to the school. *Id.* This testimony does not in and of itself meet the *Tinker* requirement that the subject speech and action forecast substantial disruption or material interference with school activities. *See Bystrom v. Fridley High Sch.,* 686 F.Supp. 1387, 1392 (D.Minn.1987) (substantial disruption established given classroom disruption after students read non-school sponsored student newspaper); *Baker v. Downey City Bd. of Educ.,* 307 F.Supp. 517 (C.D.Cal. 1969). Plaintiff's conversation and subsequent possession of the handgun took place in November 2000, over three months prior to when the school officials became aware the speech had happened, with no disruption occurring in between. While the Court understands the actions of the school administrator on February 27, 2001 locking down the school as a necessary precaution, that incident itself is not definitive proof that Plaintiff's speech and action were a substantial disruption. At this early stage in the proceeding, the Court finds that a factual question remains over what evidence Defendants relied on in concluding that Plaintiff's conversation concerning handguns and subsequent possession of a handgun off school property constituted a substantial disruption or material interference with school activities under the *Tinker* standard. Therefore, Plaintiff has stated a valid cause of action.

 Still, Defendant Derry is entitled to qualified immunity unless his alleged conduct, when committed, violated " 'clearly established statutory or constitutional

rights of which a reasonable person would have known.' " *Williams v. Smith,* 781 F.2d 319, 322 (2d Cir.1986) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 815, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). "A right is considered to be clearly established if the contours of the right are sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Danahy v. Buscaglia,* 134 F.3d 1185, 1190 (2d Cir.1998). Qualified immunity should be recognized if officials "of reasonable competence could disagree on [whether a particular action is lawful]." *Hope v. Pelzer,* 536 U.S. 730, 752, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002).

The Court has found little case law on the issue of disciplining a student for a combination of on-campus speech and off-campus action, especially in light of the possibility of school violence. This lends credence to the conclusion that this area of law is unsettled. *See Elder v. Holloway,* 510 U.S. 510, 513, 114 S.Ct. 1019, 127 L.Ed.2d 344 (1994) (finding that if the status of the right is unclear or unsettled, qualified immunity is proper). A reasonable school official facing this question for the first time would find no pre-existing body of law from which he could draw clear guidance. Without condoning violations of students' constitutional rights, qualified immunity recognizes that school officials must be allowed to make reasonable mistakes when forced to act in the face of uncertainty. Given that Defendant Derry considered both Plaintiff's speech concerning handguns and acts in obtaining possession of a handgun in concluding that Plaintiff's conduct "threatened the health, safety and welfare" of the school, the Court finds that an objectively reasonable official would not have known that drawing such a conclusion would violate a student's First Amendment right to free speech. School officials could reasonably believe they were acting within the scope of their

permissible authority. As a result, Defendant Derry is entitled to qualified immunity as it relates to Plaintiff's First Amendment claim.

## D. Equal Protection

The Equal Protection Clause requires that the government treat all similarly situated people alike. *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985) (citing *Plyler v. Doe*, 457 U.S. 202, 216, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982)). In analyzing an equal protection claim, the Court must first determine what standard of review to apply. The strict scrutiny standard should be applied if Plaintiff alleges he was treated differently because of membership in a suspect class or because he exercised a fundamental right. *Giano v. Cuomo*, 1998 WL 760262, at *5, 1998 U.S. Dist. LEXIS 17215, at *14 (N.D.N.Y. Oct. 28, 1998) (McAvoy, C.J.) (citing *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 38–40, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973)). The less rigorous "rational relationship" standard requires that Plaintiff's treatment was rationally related to a legitimate governmental interest.

Plaintiff does not allege that the he was treated differently as a result of his membership in a suspect class or the exercising of a fundamental right. Therefore, Plaintiff's equal protection claim is subject to rational basis review. Plaintiff essentially asserts a "class of one" claim, in which plaintiff alleges that he has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment. *See Bd. of Managers of Soho Int'l Arts Condo. v. City of New York*, 2004 WL 1982520, at *20, 2004 U.S. Dist. Lexis 17807, at *69–70 (S.D.N.Y. Sept. 8, 2004) (quoting *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564, 120 S.Ct. 1073, 145 L.Ed.2d 1060 (2000)).

The Second Circuit has found that to properly plead a "class of one" equal protection claim, plaintiffs need "to allege that they were 'intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment.'" *African Trade & Info. Ctr., Inc. v. Abromaitis*, 294 F.3d 355, 362 (2d Cir.2002) (quoting *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564, 120 S.Ct. 1073, 145 L.Ed.2d 1060 (2000)); *see also DeMuria v. Hawkes*, 328 F.3d 704, 707 (2d Cir.2003) (permitting a "class of one" claim to survive a motion to dismiss where the complaint only generally alleged that other individuals were treated differently); *Harlen Assocs. v. Vill. of Mineola*, 273 F.3d 494, 500 (2d Cir.2001).

Plaintiff alleges that his punishment was disproportionate to the punishment imposed upon the other two students involved in the incident, B.G. and R.R., and that there was no rational basis for such disparate treatment. Complaint (Dkt. No. 1) at ¶¶ 41–42. Specifically, Plaintiff alleges that both B.G. and R.R. were offered three week suspensions by the School District and that no such offer was made to him, and as a result, he was ultimately suspended for the rest of the school year. *Id.* at ¶ 41. Defendants contend that Plaintiff has failed to plead that he was similarly situated in all material respects to the individuals with whom he seeks to compare himself. Def. Memo. (Dkt. No. 8) at 23. Defendants contend that Plaintiff has failed to allege that the other individuals involved in the incident, B.G. and R.R., also chose to proceed with a hearing under N.Y. Education Law § 3214 rather than accept a Stipulation of Settlement, and that both B.G. and R.R. had similar disciplinary records as the Plaintiff. *Id.* at 24.

As a general rule, whether persons are similarly situated is a factual is-

sue that should be submitted to the jury, and judgment should be granted on the pleadings where it appears beyond a doubt that Plaintiff can prove no set of facts in support of his claim. *Rossi v. West Haven Bd. of Educ.*, 359 F.Supp.2d 178, 180–181, 2005 WL 578655, at *2 (D.Conn.2005); *Sec. Investor Prot. Corp. v. BDO Seidman, LLP*, 222 F.3d 63, 68 (2d Cir.2000). Plaintiff has identified individuals, B.G. and R.R., who participated in the alleged conspiracy to obtain possession of handguns. Complaint (Dkt. No. 1) at ¶ 41. R.R. obtained possession of a handgun just as Plaintiff did and B.G. supplied the handguns. *Id.* Plaintiff also does allege that the disparate treatment was done without a rational basis. *Id.* at ¶ 42. The Court's function at this stage is not to evaluate or weigh the evidence, but to view the complaint in the light most favorable to the Plaintiff. As such, the Court finds that the allegations in the complaint, by themselves, appear to be sufficient to state a "class of one" equal protection claim under *Olech* for irrational and wholly arbitrary disparate treatment.

■ Defendant Derry is not entitled to qualified immunity for this claim. Case law has clearly established the "class of one" selective enforcement claim alleged in this action. *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 565, 120 S.Ct. 1073, 145 L.Ed.2d 1060 (2000); *LaTrieste Rest. & Cabaret, Inc. v. Vill. of Port Chester*, 40 F.3d 587, 590 (2d Cir.1994) (recognizing equal protection claim based on selective enforcement). Under the facts presented in the complaint, the Court cannot say as a matter of law that a reasonable official in Defendant Derry's position would not have understood that it would be wrong to irrationally treat the Plaintiff differently than B.G. and R.R. Therefore, at this stage of the litigation, Defendant Derry is not entitled to qualified immunity.

## IV. CONCLUSION

For the foregoing reasons, Defendant's motion for judgment on the pleadings is **GRANTED IN PART** and **DENIED IN PART** as follows:

(1) Defendants' motion to dismiss the claims against the School District on the grounds of Eleventh Amendment immunity is **DENIED**.

(2) Defendants' motion to dismiss Plaintiff's First and Second Claims alleging violations of procedural and substantive due process as to all Defendants for failure to state a cause of action is **GRANTED**.

(3) Defendants' motion to dismiss Plaintiff's Third Claim alleging First Amendment violations as to all Defendants for failure to state a cause of action is **DENIED**, but Defendant Derry's claim of qualified immunity in his individual capacity as to the Third Claim is **GRANTED**.

(4) Defendants' motion to dismiss Plaintiff's Fifth Claim alleging Equal Protection violations as to all Defendants for failure to state a cause of action is **DENIED**, and Defendant Derry's claim of qualified immunity in his individual capacity as to the Fifth Claim is **DENIED**.

**IT IS SO ORDERED.**